UNITED STATES of America, Appellee,

v.

Eugene ROMERO, Defendant–Appellant.

No. 232, Docket 94–1024.

United States Court of Appeals,
Second Circuit.

Argued Oct. 31, 1994.

Decided April 13, 1995.

Lawrence K. Feitell, New York City, for defendant-appellant.

Eugene Romero, Lompoc, CA, pro se.

Deborah E. Landis, Asst. U.S. Atty., New York City (Mary Jo White, U.S. Atty., S.D.N.Y., Steven M. Cohen, Paul G. Gardephe, Asst. U.S. Attys., New York City, of counsel) for appellee.

Before: WINTER, MAHONEY, and GODBOLD *, Circuit Judges.

* The Honorable John C. Godbold, Circuit Judge, United States Court of Appeals for the Eleventh Circuit, sitting by designation.

**58**

WINTER, Circuit Judge:

Eugene Romero appeals from his conviction following a three-week jury trial before Judge Patterson. Romero was convicted on four counts: (i) Count One, conspiring to distribute heroin, in violation of 21 U.S.C. §§ 812, 841(a)(1), 841(b)(1)(A); (ii) Count Two, conspiring to tamper with and kill one Warren Tyson, a potential government witness, in violation of 18 U.S.C. § 1512; (iii) Count Three, procuring the murder of Warren Tyson with the purpose of preventing Tyson from providing evidence to the government, in violation of 18 U.S.C. §§ 1512(a)(1)(C), 1512(a)(2)(A); and (iv) Count Four, engaging in a continuing criminal enterprise as an organizer, supervisor, and manager, in violation of 21 U.S.C. § 848(a). Romero was sentenced principally to life imprisonment.

Romero contends, *inter alia*, that he received ineffective assistance of counsel and that the government failed to fulfill its obligations under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), regarding the release of exculpatory evidence. We disagree and affirm.

## BACKGROUND

The prosecution produced evidence establishing that from 1979 to 1991 Romero played a leadership role in a large narcotics enterprise. The evidence included testimony of law enforcement agents and accomplices, tape recordings, documents, narcotics, and narcotics paraphernalia. According to Romero's accomplice, James Jackson, Romero formed an organization in 1979 that sold heroin in the vicinity of 112th Street in Manhattan. Although the organization sold heroin in other locales, such as Bridgeport, Connecticut, Washington, D.C., and Detroit, Michigan, heroin sold in New York under the brand name "Red Apple" was the organization's primary product.

The prosecution advanced the theory that from 1980 to 1984 Romero ordered and/or participated in numerous murders, including those of rival drug dealers and unreliable members of his own organization. For example, Jackson testified that Romero attributed a cut on his hand to a struggle in which Romero slashed the throat of one victim—Barry "Bones" Wilson—with a straight razor.

In 1983, Romero moved to Detroit with his wife, Stephanie Romero, and his girlfriend, Sharece Walker, because an arrest warrant for him had been issued in New York for parole violation. Romero left Jackson in charge of the New York operation, and Walker shuttled back and forth between the two cities, bringing heroin and profits to Romero. A conflict with Jackson arose over certain monies to be passed through Walker and the use of the tradename "Red Apple." As a result, Romero moved back to New York and continued to use "Red Apple," while Jackson became a competing, but not overtly hostile, drug dealer.

Shortly thereafter, Romero expanded into the Boston market, where he became embroiled in conflict with rival drug dealers. Romero appealed to Jackson for manpower to be used in Boston. Jackson refused. Violence in Boston led to Romero's arrest and incarceration at the Federal Correctional Institution at Ray Brook, New York. Romero was in Ray Brook for two years, during which time numerous members of his organization visited him. Through visits and telephone calls, Romero remained in control of his organization. While absent, Romero put one Warren Tyson in a supervisory role, assisted by Tyson's girlfriend, Justine Roberts.

After Romero's release, he learned that an indictment had been filed in the Southern District of New York, charging him and a number of the other members of the organization with narcotics and RICO violations. Romero left New York but was arrested in Washington, D.C. on April 21, 1987, for possession of a loaded gun and half a kilogram of heroin. The charges in the outstanding indictment in the Southern District, and those stemming from his arrest in Washington, D.C., were disposed of when Romero pleaded guilty to one count of possession of heroin with intent to distribute and to RICO conspiracy. Romero was sentenced to six years in prison.

Romero continued to supervise his organization while in prison, during which time Tyson was murdered. For a number of reasons, members of Romero's organization had become suspicious that Tyson was cooperating with federal authorities. First, Tyson was not named in the 1987 indictment filed in the Southern District. Second, Tyson seemed to be released promptly every time he was arrested. Third, after being arrested in Baltimore, Tyson called another member of the organization, Deitrich McCoy, and spoke about narcotics in explicit terms. This conversation alarmed several members of the organization who suspected that Tyson had been attempting to provoke an inculpatory conversation.

At trial, Joseph Pratt, a member of Romero's organization, testified that Timothy "Heartbeat" Smith told him that he was going to speak with Romero about Tyson. Smith later told Pratt that Romero wanted Pratt and McCoy to murder Tyson. Pratt demurred absent direct authorization from Romero, and arrangements were made for Romero to call Pratt directly. Pratt testified that a call directing him to kill Warren Tyson came at the prearranged time, although Pratt was uncertain whether the caller had identified himself as Romero. According to Pratt's testimony, one Isidro Aviles then shot and killed Tyson in a Bronx restaurant as McCoy waited outside.

In 1989, Joseph Pratt was arrested and subsequently began cooperating with the government. Meanwhile, Romero had promoted Justine Roberts—who was apparently unaware of Romero's role in the death of Tyson—to an important narcotics procurement and distribution role. Pratt made monitored telephone calls to Roberts to discuss drug business, and the government obtained a wiretap authorization for Roberts' telephone. The information gathered led to the arrest of Roberts and the dismantling of the "Red Apple" organization. Roberts in turn agreed to cooperate.

The government's main case included two tape-recorded conversations between Aviles and Pratt in which Aviles admitted responsibility for the assassination of Tyson, and a transcript of Aviles's plea allocution (before a different district judge) in which he again admitted responsibility for Tyson's murder. However, Aviles had repudiated these admissions and sought to withdraw his plea. The government was served with Aviles's motion before Romero's trial began but failed to inform Romero of Aviles's change of heart. According to the government, the failure to inform Romero was the result of an oversight. After the defense learned of Aviles's attempt to withdraw his plea during the government's case, it read to the jury Aviles's affidavit in support of his motion to withdraw and statements by two witnesses that Aviles was not Tyson's killer.

## DISCUSSION

Romero's counsel's brief makes four claims: (i) the trial court erred in denying Romero's motion to sever Counts Two and Three; (ii) ineffective assistance of counsel; (iii) the prosecution failed to turn over, in a timely fashion, exculpatory evidence; and (iv) the proof offered with respect to Counts Two and Three was legally insufficient to support Romero's conviction. In addition, Romero filed a *pro se* supplemental brief making two additional claims: (v) the government violated his right to due process by delaying the filing of its indictment in order to gain a tactical advantage; and (vi) the indictment of Romero was invalid because the grand jury may have been presented with false evidence.

Romero's claim that he did not receive effective assistance of counsel fails under *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Judge Patterson appointed Lawrence A. Vogelman, an experienced defense attorney and a clinical professor in criminal law at Cardozo Law School, to represent Romero. He was assisted by Mayer Rossabi, another attorney, as well as by two students participating in the clinical program at Cardozo Law School.

█ Under *Strickland,* Romero must show that counsel's conduct did not meet "an objective standard of reasonableness", *id.* at 688, 104 S.Ct. at 2064, and that there is a reasonable probability that the outcome would have been different "but for counsel's unprofessional errors," *id.* at 694, 104 S.Ct.

at 2068. Vogelman provided a detailed affidavit refuting Romero's claims. Vogelman's trial preparation was extensive. Indeed, his records indicate that he visited Romero eight times and that his student interns visited Romero approximately once a week. Vogelman initially decided not to seek severance of Counts Two and Three. His affidavit describes this as a tactical decision. Vogelman hoped to exclude much of the evidence regarding the numerous homicides involved in running the "Red Apple" organization on the ground that it would have a prejudicial impact on the Tyson murder counts. If those Counts were severed, the argument for exclusion of the evidence relating to the murders would be considerably weakened. However, after the district court refused to exclude the evidence, Vogelman did make an oral motion to sever, which was denied.

In addition, Vogelman characterized his decision not to call Aviles and/or the two witnesses who told police that Aviles was not Tyson's killer as a tactical decision. Vogelman believed that the prosecution had powerful evidence that Aviles was involved in Tyson's murder but only weak evidence that Romero was involved. Even after he learned of Aviles's attempt to withdraw his plea, Vogelman adhered to his initial decision. He believed that reading the statements by Aviles and the witnesses to the jury was preferable because that tack would preclude cross-examination and yet permit him to argue that Aviles was not involved "without creating the appearance that [the two witnesses] were the centerpiece of the defense case." Finally, the description of Vogelman's advocacy laid out in Judge Patterson's opinion demonstrates that his performance did not fall below an "objective standard of reasonableness." *See United States v. Romero*, No. 91 Cr. 586, 1993 WL 485677, 1993 U.S. Dist. LEXIS 16528 (S.D.N.Y. Nov. 19, 1993).

 The district court's decision not to sever Counts Two and Three at the beginning of trial is reviewed for abuse of discretion. *United States v. Jones*, 16 F.3d 487, 492 (2d Cir.1994). To obtain a reversal on that ground, Romero must show that the joinder of the counts resulted in "substantial prejudice." *United States v. Blakney*, 941

F.2d 114, 116 (2d Cir.1991). In the instant case, the prejudice, if any, was not great because much of the evidence of Romero's involvement with violent narcotics operations—a basis for his conviction on Counts One and Four—would have been admissible in a separate trial as evidence of his motive for ordering Tyson's death. *See United States v. Turoff*, 853 F.2d 1037, 1042 (2d Cir.1988).

 Furthermore, in order to minimize the prejudice of the evidence of the drug-related murders introduced with respect to Counts One and Four, the district court gave the jury specific instructions regarding its proper use of that evidence in considering Counts Two and Three. *See United States v. Lasanta*, 978 F.2d 1300, 1307 (2d Cir.1992). Absent evidence to the contrary, juries are presumed to follow proper instructions designed to minimize the risk of prejudice from joinder. *Zafiro v. United States*, —— U.S. ——, ——, 113 S.Ct. 933, 939, 122 L.Ed.2d 317 (1993).

Romero contends that the district court should have reexamined its decision not to sever during the course of the trial, in particular after the court learned that Aviles attempted to withdraw his guilty plea. We fail to see how this revelation alters the severance analysis. Aviles's recantation did not materially increase the likelihood of prejudicial "spillover" from the murders undertaken concomitant with the operation of the "Red Apple" distribution network. The new evidence—the recantation—went only to Counts Two and Three, the counts upon which the "spillover" might fall and was not related to the murders described in Counts One and Four. The district court did not, therefore, abuse its discretion in failing to sever the counts subsequent to Aviles's attempted withdrawal of his plea.

 Appellant also claims he is entitled to a new trial due to the tardy disclosure of Aviles's attempt to withdraw his guilty plea. *See Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215 (1963). In addressing such a claim, we will reverse a conviction if the evidence in question "creates a reasonable doubt that did not otherwise

exist." *United States v. Agurs*, 427 U.S. 97, 112, 96 S.Ct. 2392, 2403, 49 L.Ed.2d 342 (1976). This standard is met by showing a "reasonable probability" of a different result if the defense had learned of the evidence. *United States v. Petrillo*, 821 F.2d 85, 88–89 (2d Cir.1987) (citing *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383–84, 87 L.Ed.2d 481 (1985)). In applying this standard to the instant case, we consider the materiality of Aviles's repudiation of his plea allocution, the extent to which the defense was hindered by the late revelation, and the curative steps taken in response.

■ We see no likelihood whatsoever that an earlier revelation of Aviles's actions would have altered the outcome of the trial. First, the information was of highly dubious credibility. Aviles admitted killing Tyson in a recorded conversation with Pratt, an admission that has no ready explanation if not the truth. Moreover, Aviles's plea allocution includes unequivocal statements of responsibility along with the statements, "I was actually the shooter, your Honor" and "He [Tyson] owed a friend of mine some money and he was a potential witness." Finally, Aviles's sentencing judge viewed his disavowal as unworthy of belief.

With regard to the second and third factors of our analysis, the defense strategy would not have been altered by earlier knowledge of Aviles's attempt to withdraw his plea. Defense counsel was allowed to read the statements of the two witnesses who refuted Aviles's role in Tyson's death. In addition, defense counsel read Aviles's repudiation of his plea allocution. As discussed, Vogelman reasonably believed that this constituted a good strategy for his client.

Appellant contends that, given earlier notice, the defense could have used Aviles as a witness and/or elicited testimony from the two witnesses who had previously told the authorities that Aviles did not kill Tyson. However, this is merely a reargument of the ineffective assistance claim because trial counsel did not want to put Aviles or the witnesses on the stand and thus draw to the attention of the jury the powerful evidence of Aviles's guilt, including his plea allocution and recorded admissions.

In sum, the combination of the weakness of the new evidence, the dearth of alternative strategies for the defense, and the presentation of Aviles's recantation and of the statements by the two witnesses to the jury, leads us to the conclusion that there was no "reasonable probability" of a different result if the information had been revealed to the defense earlier.

■ Appellant carries a heavy burden on his claim of insufficiency of the evidence with respect to Counts Two and Three—the murder of Tyson to prevent him from becoming a witness—and we consider the evidence in the light most favorable to the government. *United States v. Chang An–Lo*, 851 F.2d 547, 554 (2d Cir.), *cert. denied*, 488 U.S. 966, 109 S.Ct. 493, 102 L.Ed.2d 530 (1988). The crux of appellant's argument is that the government did not adduce proof that Tyson was a "witness, victim, or informant" within the meaning of 18 U.S.C. § 1512, because there had to be at the time of Tyson's murder "some identifiable governmental investigative interest in possible federal wrongdoing by a defendant." Appellant relies upon *United States v. Gonzalez*, 922 F.2d 1044 (2d Cir.), *cert. denied*, 502 U.S. 1014, 112 S.Ct. 660, 116 L.Ed.2d 751 (1991), for the propositions that the statute is implicated only by a murder at the "investigatory stage," and that the prosecution must demonstrate the existence of some form of investigation. However, as relevant here, *Gonzalez* simply affirmed the opposite. *See id.* at 1055–56. Congress had foreclosed such a loophole by providing that "an official proceeding need not be pending or about to be instituted at the time of the offense." 18 U.S.C. § 1512(e)(1); *Gonzalez*, 922 F.2d at 1055–56.

Romero also relies upon *United States v. Siegel*, 717 F.2d 9 (2d Cir.1983), as requiring an ongoing investigation. Noting that *Siegel* involved the interpretation of 18 U.S.C. § 1510, which was aimed at "prevent[ing] the communication of information relating to a violation of any criminal statute of the United States," 18 U.S.C. § 1510, appellant argues that the conviction of Martin Abrams was reversed because there was no federal investigation ongoing. This interpretation of *Siegel* is inapposite.

Abrams was the victim of a blackmail scheme. He had been threatened that, if he refused to take certain actions, the Securities and Exchange Commission would be informed of suspicious cash transactions. *Id.* at 21. We pointed to the lack of any existing federal investigation as evidence that Abrams did not have genuine knowledge that he was hindering communication with federal law enforcement officials. Moreover, we specifically stated: "[W]e do not hold that § 1510 requires the existence of an actual criminal investigator or that an ongoing criminal investigation be in progress." *Id.*

■ Any knowing interference with a potential communication between an individual who might become a witness and federal law enforcement officials falls within the ambit of Section 1512. We have thus previously noted that the statute covers "potential" witnesses. *United States v. Hernandez,* 730 F.2d 895, 898 (2d Cir.1984) ("[section] 1512 explicitly covers 'potential' witnesses"). We also agree with the Eighth Circuit's decision affirming the conviction of a defendant who threatened a witness "that if she ever said anything about the incident, he would hurt her parents." *See United States v. Grey Bear,* 828 F.2d 1286, 1295 (8th Cir.), *reh'g granted on other grounds,* 836 F.2d 1088 (1987). This threat was uttered immediately after the victim's death on an isolated stretch of highway. Clearly, no federal investigation was underway at that time. *See also United States v. Leisure,* 844 F.2d 1347, 1364 (8th Cir.), *cert. denied,* 488 U.S. 932, 109 S.Ct. 324, 102 L.Ed.2d 342 (1988) ("[I]t is only necessary for a defendant to have believed that a witness might give information to federal officials, and to have prevented this communication, to violate 18 U.S.C. § 1510.").

■ We hold, therefore, that the government did not need to offer proof that Tyson was willing to cooperate or that an investigation was underway. Rather, the statute is directed at the "intent to prevent ... communication" with federal authorities. *See* 18 U.S.C. § 1512(a)(1)(C). The government need prove only an intent to kill for the purpose of interfering with communication with federal law enforcement officials. The victim need not have agreed to cooperate with any federal authority or even to have evinced an intention or desire to so cooperate. There need not be an ongoing investigation or even any intent to investigate. Rather, the killing of an individual with the intent to frustrate the individual's possible cooperation with federal authorities is implicated by the statute. The government presented sufficient evidence that this was the reason for Tyson's assassination.

Romero's *pro se* brief claims that the government had sufficient evidence to charge him with Counts One and Four in 1987, but it waited until 1991 to gain a tactical advantage. Romero must demonstrate that the delay violated "fundamental conceptions of justice." *United States v. Lovasco,* 431 U.S. 783, 790, 97 S.Ct. 2044, 2049, 52 L.Ed.2d 752 (1977). We believe that we have already addressed this issue in *United States v. Romero,* 967 F.2d 63 (2d Cir.1992). There, Romero claimed that the 1987 plea agreement prevented the government from prosecuting him under Counts One and Four of the indictment. We rejected this contention because Count One "charge[d] Romero only with conduct that post-date[d] the 1987 plea agreement," *id.* at 67, and "there is no evidence that the government had sufficient evidence [at the time of the 1987 plea agreement] to bring a prosecution against Romero" on a continuing criminal enterprise charge, *id.* at 68. The reliance of the prosecution of Counts One and Four on the testimony of cooperating witnesses arrested after 1987 and on evidence gathered after 1987 further belies Romero's claim.

Romero's other *pro se* claim is that the grand jury may have been shown false evidence to the effect that Tyson was a cooperating informant. He reasons that otherwise the grand jury would not have returned an indictment for a violation of 18 U.S.C. § 1512. This claim rests upon the assumption that the government would have had to produce evidence that Tyson was cooperating or willing to cooperate to sustain an indictment under 18 U.S.C. § 1512. As discussed, Section 1512 does not require such evidence.

Affirmed.