

1996 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

12-2-1996

# United States v. Stansfield

Precedential or Non-Precedential:

Docket 95-7529

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1996

Recommended Citation

"United States v. Stansfield" (1996). *1996 Decisions.* Paper 1.
http://digitalcommons.law.villanova.edu/thirdcircuit_1996/1

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1996 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT


No. 95-7529


UNITED STATES OF AMERICA

v.

MERRITT G. STANSFIELD, JR.,

Appellant


On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. No. 94-cr-00138-1)


Argued September 11, 1996

BEFORE:  COWEN, LEWIS and WEIS,
Circuit Judges

(Filed December 2, 1996)

Peter Goldberger, Esq. (argued)
Law Office of Peter Goldberger
50 Rittenhouse Place
Ardmore, PA  19003-2276

Thomas C. Carroll, Esq. (argued)
Carroll & Cedrone
750 Curtis Center
Independence Square West
Philadelphia, PA  19106

        COUNSEL FOR APPELLANT

Kim D. Daniel, Esq. (argued)
Office of United States Attorney
Federal Building
228 Walnut Street
P.O. Box 11754
Harrisburg, PA  17108

        COUNSEL FOR APPELLEE

OPINION


COWEN, Circuit Judge.

     Merritt G. Stansfield appeals from a judgment rendered after
a jury trial convicting him of three counts of mail fraud in
violation of 18 U.S.C. § 1341, two counts of engaging in unlawful
monetary transactions (money laundering) in violation of 18 U.S.C.
§ 1957, one count of tampering with a witness in violation of 18
U.S.C. § 1512(a)(1)(C), and one count of criminal forfeiture
pursuant to 18 U.S.C. § 982.  He was sentenced to, inter alia,
incarceration for a term of 306 months.
     Stansfield contends that his conviction on two of the three
mail fraud counts, the two money laundering counts, and the
criminal forfeiture count must be reversed and remanded for a new
trial by reason of irregularities occurring during jury
deliberations.  He also argues that the conviction on witness
tampering must be vacated and remanded with instructions to enter
a judgment of acquittal on that count due to insufficient evidence.
Alternatively, he argues that the judgment of conviction on that
count must be reversed and remanded for a new trial on the ground
that the jury was not properly instructed.  Finally, he contends
the district court erred in several respects in applying the
federal sentencing guidelines.
     We will affirm the judgment of conviction on all counts except
the witness tampering count.  As to that count, we will reverse and
remand for a new trial.  In light of this disposition, we need not
reach Stansfield's argument that his sentence was contrary to the
guidelines.

                              I.
                              A.
     We take the facts with regard to the counts upon which
Stansfield was convicted in the light most favorable to the
government, the verdict winner.  In 1990 Stansfield's home was
destroyed by fire.  Erie Insurance Company agreed to reimburse
Stansfield for the replacement cost of the insured items, as well
as the cost from the loss of the use of his house.  In May of 1992,
Stansfield sent Erie a list of insured items he claimed were lost
in the fire.  Some of these were later found intact at other
locations.  By reason of the loss, Erie sent Stansfield checks
totalling approximately $225,000.  Stansfield used some of these
funds to purchase a boat and trailer.
     Erie and state law enforcement officials began an
investigation of the fire in 1992.  Although they determined that
arson caused the fire, Stansfield was never conclusively found to
be the arsonist.  Investigators from Erie and Pennsylvania State
Police spoke with Dwight Hoffman, a friend of Stansfield's, several
times in 1992 and early 1993.  Hoffman was quite knowledgeable
about Stansfield's home and its contents; he had stored many of
Stansfield's personal effects in his home prior to the fire.
     Hoffman's wife Dee was also a friend of Stansfield's.  When

Hoffman and Dee ended their relationship in August of 1992, Stansfield and Dee became romantically involved. Some evidence suggests that Dee Hoffman was complicit in Stansfield's scheme.

State troopers also communicated with Jack Love, whom Stansfield had solicited to burn his home. Stansfield threatened to kill Love if he told anyone of the solicitation. Love informed Stansfield in May of 1993 that law enforcement officials had contacted him about the fire.

That September, Erie referred the matter to federal postal inspectors. The Postal Inspector presented the case to the United States Attorney's Office, which requested that the Postal Inspection Service continue the investigation.

The witness tampering charge stems from an incident that occurred on October 7, 1993. On that date Stansfield entered Dwight Hoffman's home uninvited. Hoffman's parents, Eugene and Joyce, were present but Dwight Hoffman was not. When asked what he was doing there, Stansfield replied that he was "sick and tired of [Dwight] running down [Stansfield's] name and ruining [his] business." App. at 43. Stansfield struck the Hoffmans, knocking them to the ground. He repeatedly kicked Eugene Hoffman in the head and body. When Eugene Hoffman attempted to get up, Stansfield knocked him down again, kicking him in the head until Hoffman was partially unconscious. Stansfield took both the Hoffmans to the basement, where he bound their hands and feet. When Eugene Hoffman tried to free himself, Stansfield kicked him in the head several more times.

Stansfield then went upstairs, returning shortly with a shotgun and shells. He donned latex gloves, tinted "shooting" glasses, and ear protectors that are worn on shooting ranges. He loaded the gun and waited for Dwight Hoffman to arrive. When Dwight Hoffman appeared, Stansfield took him to the basement, hit him with the butt of the shotgun, and ordered him to sit next to his parents. Stansfield then placed the shotgun on the throat of Dwight Hoffman and stated, "I'm going to ask you some questions, and I want the truth, because the gun is loaded, the safety is off, and my finger is on the trigger, is that clear?" App. at 78.

Stansfield first inquired why Dwight Hoffman had "sen[t] the cops after [him] about [his] house," or why Dwight had "called the police about his fire." App. at 54, 79. At some point Dwight Hoffman lunged for the gun. It went off, firing a shot between Dwight Hoffman's neck and Joyce Hoffman's head. A struggle ensued. Eventually Dwight and Eugene Hoffman were able to subdue Stansfield until a police officer arrived.

                              B.

Stansfield was indicted on a twelve count indictment. Counts I through IV charged mail fraud. Count V charged using fire to commit mail fraud. Counts VI through X charged money laundering. Count XI, stemming from the incident on October 7, 1993, charged tampering with a witness. Count XII was criminal forfeiture predicated on the money laundering counts.

The instructions given to the jury on Count XI are one focus of this appeal, and so we recite them at length:

> The grand jury charged, with respect to count 11, that on or about October 7, 1993, in the

Middle District of Pennsylvania, the defendant, Merritt G. Stansfield, Jr., did assault and attempt to kill one Dwight E. Hoffman with the intent to prevent Hoffman's communication of information relating to Stansfield's commission of federal offenses . . . to a law enforcement officer, this being in violation of Title 18, United States Code, Section 1512(a)(1)(C).

The relevant statute on this subject is Title 18, United States Code, Section 1512, and provides as follows: Whoever knowingly uses intimidation or physical force, with intent to hinder, delay, or prevent the communication to a law enforcement officer of information relating to the commission or possible commission of a federal offense shall be guilty of a crime.

The statute is designed to protect persons who may be called to testify or give evidence in a federal proceeding, either civil or criminal, and persons who have information about federal crimes. The integrity of the federal system of justice depends upon the cooperation of such potential witnesses. If persons with information do not come forward, produce evidence and appear when summoned, the criminal justice system will be significantly impaired. This statute was devised to make it unlawful for anyone to tamper with such a witness in the manner described by the statute.

In order to prove the defendant guilty of the charge in the indictment, the government must prove each of the following elements beyond a reasonable doubt: First, that on or about the date charged, the defendant used intimidation, physical force, or threats, or attempted to do so; and second, that the defendant acted knowingly and with intent to prevent the communication to a law enforcement officer of information relating to the commission or possible commission of a federal offense.

App. at 103-05. The district court then elaborated on both of these elements and added: "The law does not require that a federal proceeding be pending at the time or even that it was about to be initiated when the intimidation, physical force or threats were made." App. at 106. Stansfield took no objection to these portions of the jury charge.

The jury returned a partial verdict convicting Stansfield on Counts I, II, III, VI, VII, and XI. As the jury was polled, juror number two was excused from the jury box because she was not

feeling well.  She eventually returned and, in the presence of the other jurors, indicated her concurrence in the guilty verdicts. During a subsequent recess, jurors number one, two, and nine communicated to the deputy clerk that they wished to speak with the court.  They did not indicate the reasons for wanting to do so. After consulting with counsel, the court declined to hear from the jurors at that time.

The jury was brought into the courtroom and directed to deliberate on Count XII, which had not previously been submitted to it.  A mistrial was subsequently declared as to Counts IV, V, VIII, IX, and X.  The government later dismissed those counts subject to reinstatement should any portion of the conviction be vacated. Immediately after the jury returned to the jury room to commence deliberations on Count XII, jurors number one, four, and nine abruptly left the jury room and refused to return.  The three apparently were crying and were "emotionally distraught."  App. at 143.  They stated that "they had reasons for [initially] voting the way they did" and had been told they were "stupid."  App. at 143. At this point, Stansfield waived his right to a jury trial with regard to Count XII and the jury was discharged.  The district court found Stansfield guilty on Count XII.

The district court thereafter met with the three jurors, first as a group and later individually.  All three were women who had previously asked to speak with the district court.  All three stated they had been pressured into concurring with the guilty verdicts by the jury foreman who, along with other jurors, had used gender-based insults to intimidate them.  The jurors stated as an example that they were called "stupid female[s]" and were told that they "didn't have minds" because they are women.  App. at 169, 156.  One of the jurors stated that a fourth juror, who had not felt well during the jury poll, also had been affected by these gender-based insults.  All three indicated that, but for the pressure that the other jurors exerted on them, they would have voted for acquittal on Counts II, VI, and VII.  Juror number one related that she also would have voted for acquittal on Count I.

Stansfield moved to vacate the convictions on those four counts.  The court denied the motion.  The district court sentenced Stansfield to, inter alia, 306 months incarceration.  The sentence was to run concurrently with a 7 1/2 to 15 year sentence imposed in the Court of Common Pleas of Dauphin County, Pennsylvania, stemming from the October 7, 1993, incident.  This appeal followed.

II.

A.

Stansfield contends that, based on the in camera questioning of jurors number one, four, and nine, the verdict as to Counts I, II, VI, and VII was not unanimous and the matter should be remanded for a new trial on these counts.  Moreover, he contends that because the forfeiture count on which he was convicted, Count XII, was predicated on the guilty verdict on Counts VI and VII, that count should also be reversed and remanded.  We hold that, pursuant to Fed. R. Evid. 606(b), consideration of the testimony of those jurors is not permitted.  The judgment of conviction on those counts will be affirmed.

It is a common-law rule of ancient vintage that a jury's

verdict may not be impeached by the testimony of a juror concerning any influences on the jury's deliberations that emanated from within the jury room. See Tanner v. United States, 483 U.S. 107, 117, 107 S.Ct. 2739, 2745-46 (1987); McDonald v. Pless, 238 U.S. 264, 268, 35 S.Ct. 783, 784 (1915); Government of Virgin Islands v. Gereau, 523 F.2d 140, 148 n.19 (3d Cir. 1975), cert. denied, 424 U.S. 917, 96 S.Ct. 1119 (1976). That precept has been codified in the federal system as Fed. R. Evid. 606(b), which provides, in relevant part:

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror.

See also Tanner, 483 U.S. at 121, 107 S.Ct. at 2748; Gereau, 523 F.2d at 149 n.22. Testimony concerning "intimidation or harassment of one juror by another" falls squarely within the core prohibition of the Rule. Id. at 150.

Recognizing the considerable obstacle this provision places in his path, Stansfield attempts to clear the hurdle in two ways. First, he contends that Rule 606(b) is implicated only after a jury has been discharged. Because the district court was aware of an irregularity before it discharged the jury, the argument goes, it should have waited to discharge them until it had spoken to the three jurors. Second, he argues, although Rule 606(b) bars members of a jury from impeaching is own verdict, it does not bar the use of jurors' testimony to impeach an allegedly defective jury poll. We address these contentions in turn.

1.

There is some support for Stansfield's argument that timing is relevant in considering the implications of Rule 606(b). In Tanner, 483 U.S. at 127, 107 S.Ct. at 2751, the Supreme Court stated, in dicta, that jurors "may report inappropriate juror behavior to the court before they render a verdict." In Government of Virgin Islands v. Nicholas, 759 F.2d 1073, 1078 (3d Cir. 1985), we wrote that "questions concerning the competency of a jury ordinarily are not entertained once the jury has rendered its verdict" (emphasis added). And in Gereau, 523 F.2d at 148, we stated that "a juror may not impeach [her] own verdict once the jury has been discharged" (emphasis added).

Recognizing that the testimony of the three jurors here was proffered after the verdict was read into the record, after the jury was polled and indicated its unanimous consent, and after the jury was discharged, Stansfield first contends that the district

court judge had a duty to meet with the three jurors as soon as they first requested to speak with him. This request occurred after the partial verdict was rendered and the jury was polled, but before it commenced deliberations on Count XII. Essentially, the contention is that the district court abused its discretion in not conferring with the three jurors when they first requested to speak with him.

It is apparent from the record, however, that at the time of the first request, the district court had no indication of the reason for the requested meeting. Moreover, even if the district court had an idea of the reasons for the requested conference, it enjoys considerable discretion in determining how to deal with allegations of juror misconduct. See United States v. Resko, 3 F.3d 684, 690 (3d Cir. 1993); Government of Virgin Islands v. Dowling, 814 F.2d 134, 137 (3d Cir. 1987). We cannot conclude that the district court abused its discretion in declining to meet with the three jurors when they first requested a meeting.

Stansfield further contends that, at the very least, the district court should have made inquiry immediately after the three jurors bolted from the jury room, instead of first discharging the jury. This contention would have merit only if there were a relevant distinction between receiving juror testimony to impeach a verdict before the jury is discharged and doing so after it is discharged. If such a distinction is not relevant then the district court could not have abused its discretion in first discharging the jury and then questioning the three jurors. Stansfield's argument is essentially that Rule 606(b) comes into play only when the jury has been discharged and not at some earlier point in the proceedings, such as when the verdict is rendered or the jury polled.

This contention was squarely addressed and rejected by the Court of Appeals for the Second Circuit in United States v. Hockridge, 573 F.2d 752, 758-60 (2d Cir.), cert. denied, 439 U.S. 821, 99 S.Ct. 85 (1978). In Hockridge, as in this case, a partial verdict was rendered in a criminal case and the jury sent back for further deliberations on the remainder of the verdict. See id. at 756-57. During those deliberations, two jurors spoke with the district court in camera and expressed reservations about their concurrence in the partial verdicts. See id. at 757. On appeal the defendants argued that Rule 606(b) is inapplicable where a partial verdict has been rendered but the jury has not yet been discharged. See id. at 758.

The Court of Appeals for the Second Circuit rejected this argument. It reasoned that applying Rule 606(b) even before the jury has been discharged furthers two important objectives: verdict finality and enhancing the jury's freedom of deliberation. See id. at 759. As for the first objective, the court recognized that while "finality is not sought for its own sake," allowing a partial verdict to be impeached while deliberations ensue on the remainder of the verdict would essentially eviscerate the benefits sought to be achieved by allowing partial verdicts in the first place. Id. As for freedom of jury deliberations, the court noted that "the legislative history of Rule 606(b), while perhaps not determinative, reveals the strong congressional purpose of

protecting the jury deliberation process," and concluded that "the policy against intrusion into internal deliberations remains the same," irrespective of whether a partial verdict or a complete verdict is at issue. Id. Thus, the court concluded, "where a partial verdict has been recorded, we perceive no reasons of sufficient magnitude to depart from the normal rule governing impeachment of jury verdicts." Id. We agree.

In Gereau, 523 F.2d at 148, we identified several objectives that Rule 606(b) was designed to foster: "(1) discouraging harassment of jurors by losing parties eager to have the verdict set aside; (2) encouraging free and open discussion among jurors; (3) reducing incentives for jury tampering; (4) promoting verdict finality; [and] (5) maintaining the viability of the jury as a judicial decision-making body." Of these goals, the first and third would be unaffected by erecting the Rule 606(b) barrier at some point prior to discharge of the jury.

As explained at length by the Court of Appeals for the Second Circuit in Hockridge, 573 F.2d at 759-60, employing the prohibitions of Rule 606(b) even before the jury is discharged serves to foster both the openness of jury deliberations and verdict finality. It also serves to further the fifth goal we identified in Gereau, which is intrinsically related to the goals of free deliberation and finality: that of maintaining the jury's integrity as an independent decision-making body within the judicial branch of government. Thus, while only some of the objectives of Rule 606(b) are fostered by applying that Rule before jury discharge, we conclude that these considerations are sufficient to make that Rule fully applicable at that point in time.

Finally, Stansfield cites United States v. Marinari, 32 F.3d 1209, 1214 (7th Cir. 1994), for the proposition that "[u]ntil the jury is actually discharged by separating or dispersing (not merely being declared discharged), the verdict remains subject to review" and thus "finality of the verdict comes upon the separation and dispersal of the jurors." Stansfield misconstrues the case. In Marinari, the Court of Appeals for the Seventh Circuit was addressing finality as it relates to "record[ation]" of a verdict within the meaning of Fed. R. Crim. P. 31(d), not as it relates to the triggering of the prohibition of Fed. R. Evid. 606(b). Marinaridid not involve an application of Rule 606(b), nor did the court have any reason to discuss the implications of that Rule. Although the court held that a jury could be recalled before actual dispersal for purposes of conducting a jury poll, it never suggested that individual members of the jury were ever competent to impeach the jury verdict. Marinari is useful only to the extent that it recognizes that formal discharge is not as crucial as actual dispersal. One cannot infer from the court's language that Rule 606(b) is implicated only upon discharge, dispersal, or separation of the jury, as opposed to some earlier point in the proceedings.

In fact, Marinari supports our conclusion. The Court of Appeals for the Seventh Circuit held that recordation of the verdict takes place upon actual dispersal or separation of the jury only when the jury has not been polled. See id. at 1213. On the

other hand, "[w]here a poll is taken, the verdict becomes final and `recorded,' when the twelfth juror's assent to that verdict is made on the record."  Id.  Here, the jury was polled and, according to Marinari, the partial verdict became final when juror number twelve concurred with the verdict on the record.

Moreover, the reasons the Court of Appeals for the Seventh Circuit gave for establishing actual separation or dispersal as the "point of no return" for purposes of conducting a jury poll are inapposite to the issue of where that point is located for purposes of inquiry into internal influences on the jurors.  The court reasoned that, before dispersal of the jury, individual jurors continue to be isolated from contact with the outside world and, therefore, their answers to a jury poll would not be tainted by external influences until dispersal.  See id. at 1214.  As noted above, while several of the policies underlying the prohibition embodied in Rule 606(b) assume that there will have been contact with the outside world, and therefore those policies are not implicated if the Rule were to apply before discharge, the other rationales behind Rule 606(b) apply with full force even before the jury is discharged.  Marinari is fully consistent with our ruling.

We need not address definitively the point at which Fed. R. Evid. 606(b) comes into play.  We hold only that its prohibition on using juror testimony to impeach the jury's verdict applies at some point prior to the discharge of the jury.  Had the district court here questioned the three jurors prior to the jury's discharge, the jurors still would have been incompetent by virtue of Rule 606(b) to impeach the jury's verdict.  Stansfield's contention that the district court abused its discretion by questioning the jurors only after it discharged the jury is without merit.

2.

Stansfield also seeks to avoid the Rule 606(b) hurdle by characterizing the juror's testimony as tending to impeach the integrity of the jury poll rather than the verdict itself. Stansfield does not contend that any irregularity occurred during the polling process itself that would have alerted the court to the true nature of the problem.  Although juror number two excused herself because she was not feeling well, it did not become apparent until much later that this juror's health may have been affected by something that occurred in the jury room.  Moreover, the three jurors who eventually spoke with the court in camerarequested to do so only after the polling process was completed.

Stansfield's argument at bottom is the contention that the jury poll can be attacked by subsequent juror recantation even though the verdict itself cannot.  This distinction is unavailing. The jury poll is not a distinct entity that exists separate and apart from the verdict.  Rather, the jury poll is a mere reflection of the verdict.  To attempt to impeach the poll by reference to intimidation that the jurors claim they felt during deliberations, or that they feared they would again feel when they resumed their deliberations, is no different than attacking the verdict directly. Rule 606(b) forbids this.

Moreover, adopting Stansfield's position would mean that no jury poll following the rendering of a partial verdict would be beyond attack through the use of juror testimony, at least not

until the time that a complete verdict is rendered or a partial mistrial declared.  Since taking a jury poll at that time would thus become a futile gesture, juries would not be polled (and the partial verdict would not be validated) until it became certain that they would deliberate no longer.  Congress could not have intended Fed. R. Evid. 606(b) to so fully diminish the beneficial effects of partial verdicts.  See Hockridge, 573 F.2d at 759.

We conclude that Fed. R. Evid. 606(b) embodies a decision that the costs of making an inquiry into possible juror misbehavior in circumstances such as these outweigh the potential benefits. Accordingly, the judgment of conviction with respect to Counts I, II, VI, VII, and XII will be affirmed.

## B.

Stansfield asks us to reverse his conviction on Count XI, the tampering with a witness count, and remand with directions to enter a judgment of acquittal on that count on the grounds that the evidence was insufficient to support a conviction.  Specifically, he argues that the evidence was deficient in two respects:  it did not prove that he intended to hinder Dwight Hoffman's futurecommunication with law enforcement officials, and it did not prove that he intended to prevent Hoffman's communications with a federallaw enforcement officer.  Alternatively, he contends that the jury was not properly instructed either on the "attempt to kill" element of the statute pursuant to which he was convicted or on the "federal officer" element.  Accordingly, he argues, his conviction must be reversed and the matter remanded for a new trial on Count XI.  We address each contention in turn.

## 1.

Count XI of the indictment charged that, on or about October 7, 1993, Stansfield "did assault and attempt to kill one Dwight E. Hoffman with the intent to prevent Hoffman's communication of information relating to STANSFIELD'S commission of federal offenses . . . to a law enforcement officer" in violation of 18 U.S.C. § 1512(a)(1)(C).  App. at 35.  Title 18 U.S.C. § 1512(a)(1)(C) provides, in pertinent part:  "Whoever kills or attempts to kill another person, with intent to prevent the communication by any person to a law enforcement officer . . . of information relating to the commission or possible commission of a Federal offense" shall be imprisoned for up to twenty years.

The term "law enforcement officer" is defined as "an officer or employee of the Federal Government, or a person authorized to act for or on behalf of the Federal Government or serving the Federal Government as an adviser or consultant authorized under law to engage in or supervise the prevention, detection, investigation, or prosecution of an offense."  Id. § 1515(a)(4).  However, the government need not prove that Stansfield knew or intended "that the law enforcement officer is an officer or employee of the Federal Government or a person authorized to act for or on behalf of the Federal Government."  Id. § 1512(f).

As we stated in United States v. Carr, 25 F.3d 1194, 1201 (3d Cir.) (quoting United States v. Casper, 956 F.2d 416, 421 (3d Cir. 1992)), cert. denied, ___ U.S. ___, 115 S.Ct. 341 (1994), we

"must sustain the verdict of a jury if there
is substantial evidence, viewed in the light

most favorable to the Government, to uphold
the jury's decision.  In determining whether
evidence is sufficient, we will not weigh
evidence or determine the credibility of
witnesses.  Appellate reversal on the grounds
of insufficient evidence should be confined to
cases where the failure of the prosecution is
clear.  The evidence need not be inconsistent
with every conclusion save that of guilt, so
long as it establishes a case from which a
jury could find the defendant guilty beyond a
reasonable doubt."

a.

The evidence proved that Stansfield held a shotgun at Dwight
Hoffman's throat and asked him a number of questions, including why
Hoffman had told law enforcement officials about the fire at
Stansfield's house.  This evidence is sufficient for a jury to
conclude beyond a reasonable doubt that Stansfield intended to
prevent Hoffman's future communications with law enforcement
officials, not merely that he intended to retaliate against Hoffman
for past communications with law enforcement officials.  The jury
in its opinion could reasonably conclude that inherent in the
action of pointing a loaded firearm at another's throat and asking,
in effect, "Why did you do it?" is the implicit message, "Don't
ever do it again."  We conclude that the evidence was sufficient to
prove that Stansfield intended to foreclose future communications
by Hoffman with law enforcement officials.

b.

We also find the evidence sufficed to satisfy the "federal
officer" element of 18 U.S.C. §§ 1512(a)(1)(C) and 1515(a)(4).  The
parties dispute what the government has to prove in order to
satisfy this requirement.  Stansfield urges that the government
must prove "an intent to prevent the communication of information
to some particular law enforcement officer, or at least to any
agent involved in a particular, actual federal investigation," as
long as that officer is federal.  Appellant's Brief at 16.  The
government argues that it need only prove that the offense about
which the defendant wishes to prevent communications is actually a
federal offense.

The case law from our sister circuits does not support
Stansfield's view.  The Court of Appeals for the Second Circuit in
United States v. Romero, 54 F.3d 56, 62 (2d Cir. 1995), cert.
denied, ___ U.S. ___, 116 S.Ct. 1449 (1996) wrote:  "There need not
be an ongoing investigation or even any intent to investigate.
Rather, the killing of an individual with the intent to frustrate
the individual's possible cooperation with federal authorities is
implicated by the statute" (emphasis added).  The Court of Appeals
for the Seventh Circuit in United States v. Edwards, 36 F.3d 639,
645 (7th Cir. 1994), held that what is essential is that "the
defendant believed that a person might furnish information to
federal officials and that he killed or attempted to kill that
person in order to prevent such disclosure" (second emphasis
added).  Accord United States v. Galvan, 949 F.2d 777, 783 (5th

Cir. 1991) ("[T]he statute focuses on the defendant's intent: whether she thought she might be preventing [the witness'] future communication of information.") (emphasis added); United States v. Leisure, 844 F.2d 1347, 1364 (8th Cir.), cert. denied, 488 U.S. 932, 109 S.Ct. 324 (1988) ("[I]t is only necessary for a defendant to have believed that a witness might give information to federal officials, and to have prevented this communication, to violate 18 U.S.C. § 1510.").

This is not to say that the position of the government is without problems. Were we to require only that the government prove that the underlying offense is federal and that the defendant intended to prevent the witness from communicating with law enforcement officials in general, without also proving the defendant's knowledge of or belief in the possibility that the witness would communicate with federal authorities, we would essentially vitiate an important facet of the intent requirement of the statute.

Accordingly, we hold that, in order to obtain a conviction pursuant to § 1512(a)(1)(C), the government must prove: (1) the defendant killed or attempted to kill a person; (2) the defendant was motivated by a desire to prevent the communication between any person and law enforcement authorities concerning the commission or possible commission of an offense; (3) that offense was actually a federal offense; and (4) the defendant believed that the person in (2) above might communicate with the federal authorities. This last element may be inferred by the jury from the fact that the offense was federal in nature, plus additional appropriate evidence. For example, it is sufficient (but not necessary) that the government prove that the defendant had actual knowledge of the federal nature of the offense in order for the jury to infer the last element.

This framework is an appropriate reconciliation between the constraint that the government must prove the defendant's specific intent to hinder a federal investigation and the fact that, by virtue of § 1512(f), it need not prove that the defendant knew the federal status of any particular law enforcement officer involved in an investigation. Cf. United States v. Gonzalez, 922 F.2d 1044, 1054 (2d Cir.), cert. denied, 502 U.S. 1014, 112 S.Ct. 660 (1991); United States v. Scaife, 749 F.2d 338, 348 (6th Cir. 1984).

In this matter, the underlying offense clearly was a federal offense. The evidence reflected that Hoffman had already cooperated several times with state authorities and with Erie. Stansfield had knowledge of Hoffman's past cooperation and was aware that some investigation, though not necessarily a federal one, was underway. Moreover, though it is unclear whether Stansfield was aware of it, the evidence also showed that federal authorities had begun an investigation approximately one month prior to the conduct in question. Given that Stansfield violated several federal laws and based on the actions he took thereafter, a jury could reasonably find beyond a reasonable doubt that the attack was motivated, at least in part, by Stansfield's belief that Hoffman might cooperate with federal authorities. See Gonzalez, 922 F.2d at 1054. We conclude that the evidence was sufficient to

support a conviction under 18 U.S.C. § 1512(a)(1)(C).

## 2.

### a.

Although Stansfield was indicted under 18 U.S.C. § 1512(a)(1)(C), the district court, without objection from counsel, instructed the jury on a different but related offense, 18 U.S.C. § 1512(b)(3).  After reading count XI of the indictment verbatim, the district court instructed the jury:  "Whoever knowingly uses intimidation or physical force, with intent to hinder, delay, or prevent the communication to a law enforcement officer of information relating to the commission or possible commission of a federal offense shall be guilty of a crime."  App. at 104 (emphasis added).  This reflects the language of § 1512(b)(3), which provides, in relevant part:  "Whoever knowingly uses intimidation or physical force [or] threatens . . . another person, or attempts to do so, . . . with intent to hinder, delay or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense" is guilty of a crime.  The district court proceeded to set forth and explain the elements of a violation of § 1512(b)(3), not § 1512(a)(1)(C).

Because there was no objection to the charge, Fed. R. Crim. P.52(b) is implicated.  The Rule provides:  "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."  The concept of "plain error" comprises four elements:  (1) there must be an error, seeUnited States v. Olano, 507 U.S. 725, 733–34, 113 S.Ct. 1770, 1777–78 (1993); (2) the error must be "plain," meaning "clear" or "obvious," id.; (3) the plain error must be one "affecting substantial rights," i.e., "it must have been prejudicial:  It must have affected the outcome of the District Court proceedings," id.; and (4) because "Rule 52(b) is permissive, not mandatory," the court should correct plain error affecting substantial rights only where the error (a) "causes the conviction or sentencing of an actually innocent defendant," or (b) "`seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'"  Id. at 735–36, 113 S.Ct. at 1778–79 (quoting United States v. Atkinson, 297 U.S. 157, 160, 56 S.Ct. 391, 392 (1936)) (alteration added).

For our purposes the difference between § 1512(a)(1)(C) and § 1512(b)(3) is that the former includes an "attempt to kill" element while the latter includes only a "uses intimidation or physical force" element.  The question we face, then, is whether the omission of the "attempt to kill" element constituted plain error and requires us to reverse Stansfield's conviction on Count XI.  We hold it does.

This Court has declined to adopt a per se rule that the omission of an essential element of an offense from jury instructions constitutes plain error.  See United States v. Xavier, 2 F.3d 1281, 1287 (3d Cir. 1993).  However, we have also stated that such an omission "`ordinarily constitutes plain error.'"  Id.(quoting Government of Virgin Islands v. Brown, 685 F.2d 834, 839 (3d Cir. 1982)) (emphasis in Xavier).  See also United States v. Retos, 25 F.3d 1220, 1231 (3d Cir. 1994); United States v.

Anderson, 859 F.2d 1171, 1176 (3d Cir. 1988); United States v. Small, 472 F.2d 818, 819 (3d Cir. 1972). This "general rule . . . is consistent with the Supreme Court's instruction that due process requires `proof beyond a reasonable doubt of every fact necessary to constitute the crime with which [the defendant] is charged.'" Xavier, 2 F.3d at 1287 (quoting In re Winship, 397 U.S. 358, 364, 90 S.Ct. 1068, 1073 (1970)) (alteration added).

The omission of an essential element of an offense from the jury instructions usually will be obvious error, and therefore ordinarily satisfies the first and second requirements of Olano, 507 U.S. at 733-34, 113 S.Ct. at 1777. We have little trouble in concluding that the omission of the attempt to kill element in this case satisfies those first two requirements. See generally Retos, 25 F.3d at 1229-30. We therefore turn to the cases that have discussed the third and fourth steps of Olano.

In Xavier, 2 F.3d at 1286, the defendant was convicted of aiding and abetting the possession of a firearm by a convicted felon. The jury was never instructed that knowledge of the status of the primary wrongdoer (defendant's brother) as a felon was an essential element of the crime. Concluding that the omission constituted plain error, the court wrote that "there can be no question that the failure to instruct had an impact on the jury's deliberations, because the jury could not have been expected to make a finding beyond a reasonable doubt as to [defendant's] knowledge of his brother's status as a felon in the absence of an instruction to do so." Id. at 1287. Thus, the third Olano step was satisfied. The consequent effect on defendant's due process rights were such that the error "seriously affected the fairness, integrity or public reputation of judicial proceedings," which satisfied Olano's fourth and final step. Id. (internal quotation marks omitted).

Similarly, in Retos, 25 F.3d at 1229-30, the district court failed to instruct the jury that, to convict the defendant for currency structuring in violation of 31 U.S.C. §§ 5322 and 5324(3), it was required to find that he actually knew that such structuring was unlawful, pursuant to the Supreme Court's decision in Ratzlaf v. United States, 510 U.S. 135, ___, 114 S.Ct. 655, 663 (1994). With respect to the third Olano step, we wrote that, because "the evidence presented by the government on [the defendant's] structuring count, while sufficient, was not conclusive . . . we cannot be certain that the jury found beyond a reasonable doubt that Retos knew his actions were unlawful, absent a specific instruction from the district court judge." Id. at 1232. We then concluded that, inasmuch as the defendant suffered "severe prejudice," which is "a hallmark of manifest injustice," the omission in the jury charge "`seriously affect[ed] the fairness'" of the trial and satisfied the fourth Olano step. Id. at 1232 (quoting Olano, 507 U.S at 736, 113 S.Ct. at 1779) (alteration in Retos).

By contrast, in Anderson, 859 F.2d at 1176, the district court had failed to instruct the jury that to find the defendant guilty of a continuing criminal enterprise ("CCE"), it was required to unanimously agree that he committed three violations of the federal drug laws. However, the jury convicted the defendant of three

counts of heroin distribution and one count of conspiracy to possess with intent to distribute heroin and cocaine, as well as the CCE count.  See id..  Thus, the jury necessarily made the determination of guilt that was a predicate to conviction on the CCE count even though it was not properly instructed.  We refused to find plain error because it was not possible that the jury did not find the omitted element of the offense beyond a reasonable doubt.  See id.

Such is not the case here.  As in Xavier and Retos, the omission of the "attempt to kill" instruction satisfies both the third and fourth steps of the Olano analysis and constitutes plain error.  As for the third step, while there was overwhelming evidence that Stansfield "use[d] intimidation or physical force" against Dwight Hoffman, the evidence that he attempted to kill Hoffman, while perhaps sufficient to support a conviction by a properly instructed jury, was more sketchy and circumstantial in nature.  It is quite likely that the outcome on Count XI would have been different given a proper charge.  Even if we conclude that the jury found beyond a reasonable doubt that Stansfield violated 18 U.S.C. § 1512(b)(3), that is a less serious offense, with a statutory maximum sentence of ten years, as opposed to the twenty year maximum provided for by § 1512(a)(1)(C).  We conclude that the error was not harmless.

We also conclude that the fourth Olano step, that the error "seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings," is satisfied by the failure to instruct a jury that in order to convict a defendant of attempting to kill another to achieve a desired result, the jury must find he actually attempted to kill that person.  Instructing a jury essentially that this element may be satisfied by showing the defendant "merely" intimidated or used physical force, and then adjudging him guilty of the more serious crime, is the type of error that would impugn the judicial system and bring it into disrepute.

The government contends that the error was harmless and did not "seriously affect the fairness, integrity or public reputation of judicial proceedings."  It argues that Stansfield never disputed he attempted to kill Dwight Hoffman and the evidence was overwhelming that he did.  This argument is not persuasive.  First, the evidence was far from overwhelming or conclusive that Stansfield attempted to kill Hoffman.  Second, the government cites only Stansfield's closing argument, in which his attorney conceded that Stansfield "may well have intended to kill" the Hoffmans, Supp. App. at 29, for the proposition that he did not dispute that element of the offense.  Even if this language were truly a stipulation, which it is not, it concedes only that Stansfield intended to kill Dwight Hoffman, not that he attempted to kill Dwight Hoffman.  Moreover, arguments of counsel are not evidence but are merely comments on evidence.  Stansfield's closing argument did not relieve the government of its burden of proving beyond a reasonable doubt that Stansfield attempted to kill Dwight Hoffman.

We conclude that the omission of the "intent to kill" element from the instructions given the jury constituted plain error. Accordingly, Stansfield's conviction on Count XI for violating 18 U.S.C. § 1512(a)(1)(C) must be reversed and remanded for a new

trial.

b.

Stansfield also argues that the district court erred by failing to instruct the jury that the "law enforcement officer" referred to in § 1512 be an existing federal officer actually investigating the federal offense pursuant to 18 U.S.C. § 1515(a)(4). Stansfield did not contemporaneously object to the instructions. The instruction given the jury was not in accord with what we have held regarding this element of the offense. See supra at 22.

On remand, the jury should be instructed that in order to find Stansfield guilty of a violation of 18 U.S.C. § 1512(a)(1)(C), it must find in addition to the other elements of the offense both that he was motivated by a belief that the victim might communicate with federal authorities concerning the commission or possible commission of an offense, and that the offense in question is in fact a federal offense. Given appropriate evidence, if the jury finds the latter fact to exist, it may find the former to exist as well.

III.

The judgment of conviction entered September 15, 1995, is affirmed as to Counts I, II, III, VI, VII, and XII. The judgment of conviction on Count XI is reversed. The judgment of sentencing on all counts is vacated. The case is remanded to the district court for further proceedings consistent with this opinion.


United States v. Merritt G. Stansfield, Jr.
No. 95-7529


LEWIS, Circuit Judge, concurring and dissenting.

I agree with the majority's analysis and conclusions in all respects but one. As to Count XI of the indictment, which charged Stansfield with witness tampering, I cannot agree with the majority's conclusion that "the evidence was sufficient to support a conviction under 18 U.S.C. § 1512(a)(1)(C)." Maj. Op. at 26. In my view, this result rests upon an erroneous application of 18 U.S.C. § 1512(a)(1)(C), one which is not supported by either the case law on which the majority relies or the language of the statute itself. And our disagreement is significant not only because of the effect the majority's application will have on the government's burden of proof in future cases brought under this statute, but because if the majority is correct Stansfield will in all likelihood be retried on this twenty-year count, whereas if my understanding is correct the appropriate disposition is a judgment of acquittal due to the government's failure to introduce evidence to sustain a conviction on this count.

The majority purportedly rejects the government's argument that it "need only prove that the offense about which the defendant wishes to prevent communications is actually a federal offense." Maj. Op. at 20 (emphasis added). Here, the majority and I are in agreement, for the government's argument essentially asks that it

be required to prove nothing.  Instead, the majority offers a four-part construction of the statute, which requires the government to prove, inter alia, that the defendant believed that the victim might communicate with federal authorities.  Id. at 22.  Unfortunately, the majority fails to apply its own construction of the statute, finding Stansfield's conviction supportable based solely on the federal nature of his offense and evidence showing that a file had been opened by federal authorities.  Stansfield's intent is irrelevant under the majority's analysis.  Contending that Stansfield's intent "may be inferred," id., from the mere fact that the underlying offense happened to be a federal offense, even though the government offered absolutely no evidence to show that Stansfield had any knowledge, awareness or belief that he had committed a federal offense or was the subject of a federal investigation, the majority essentially eviscerates the intent element of the statute.  I cannot agree with this analysis.  Instead, I believe the government must demonstrate, through direct or circumstantial evidence -- but beyond a reasonable doubt -- that Stansfield believed that the underlying offense was federal or was being investigated by federal authorities with whom the victim of the threats might communicate.  It is this important element -- some evidence of the defendant's awareness of the federal nature of his crime, which in turn could form the basis for his intent to prevent a communication about it to a federal official -- that is missing from both the majority's analysis and the government's proof in this case.  And while the majority concedes that proof of either of these things would be sufficient to establish a defendant's intent, it offers no explanation as to how else a defendant's intent could possibly be established.

Moreover, the majority's reliance on case law from other circuits to support its conclusion is misguided.  The question presented in Romero, Edwards, and Leisure was whether § 1512 required the presence of an ongoing federal investigation to support a conviction for witness tampering under the statute.  SeeUnited States v. Romero, 54 F.3d 56 (2d Cir. 1995), cert. denied, ___ U.S. ___, 116 S. Ct. 1449 (1996); United States v Edwards, 36 F.3d 639 (7th Cir. 1994); United States v. Leisure, 844 F.2d 1347 (8th Cir. 1988).  While it is true that these cases rejected the requirement of an ongoing investigation, they do not support the majority's conclusion here that a defendant's intent can be inferred, without more, by the mere fact that the defendant committed a federal crime.  On the contrary, in each of these cases the defendant had knowledge of the federal nature of the crime and of the consequent potential of a federal investigation.  In Romero, for example, the court noted that "members of [the defendant's] organization had become suspicious that [the witness] was cooperating with federal authorities."  Romero, 54 F.3d at 59.  And in Edwards, the government presented testimony which indicated that the defendants killed the victim "because they feared he was informing the DEA about their operations."  Edwards, 36 F.3d at 645 (emphasis added).  Thus, although the government need not prove the presence of an ongoing federal investigation, it must at least prove "that the defendant believed that a person might furnish information to federal officials and that he killed or attempted to

kill that person in order to prevent such disclosure."  Id.(emphasis added) (citing Leisure, 844 F.2d at 1364).

Title 18 U.S.C. § 1512(a)(1)(C) provides:  "Whoever kills or attempts to kill another person with intent to prevent the communication by any person to a law enforcement officer . . . of the United States of information relating to the commission or possible commission of a Federal offense" shall be imprisoned for up to twenty years.  As the majority notes, "law enforcement officer" is defined as "an officer or employee of the Federal government, or a person authorized to act for or on behalf of the Federal government . . . ."  18 U.S.C. § 1515(a)(4)(A).  Thus, at a minimum, the government must prove that the defendant believed that there was a possibility of a federal investigation.

The majority is overly generous to the government, however, in stating that Stansfield "was aware that some investigation, though not necessarily a federal one, was under way," and concluding that this is enough to support his conviction.  Maj. Op. at 25-26.  In fact, the government did not introduce any evidence to suggest that Stansfield could have known of the possibility of a federalinvestigation.  The evidence only established that Stansfield knew that the Pennsylvania State Police and Erie Insurance Company were interviewing potential witnesses and pursuing an investigation, and that Hoffman had been interviewed by both.  It is obvious from the evidence that he was angry that Hoffman might be cooperating with a state official (who happened to be the only law enforcement officer conducting any investigation at that time), not a federal official.  We don't know, and the government has not shown, that he even had any reason to believe that his offenses were federal in nature, or that the victims might communicate with federal authorities.  In light of the total lack of evidence in this respect, I am perplexed by the majority's conclusion that a jury could have concluded beyond a reasonable doubt that Stansfield believed that Hoffman might cooperate with federal authorities.  There is simply no basis in the record to justify this conclusion.

Moreover, while the majority states that "the evidence also showed that federal authorities had begun an investigation approximately one month prior to the conduct in question[,]" id. at 26, in fact, the evidence showed that Postal Inspectors had merely opened a file on the case and had done nothing more.  But unless he had a mole inside the Postal Inspection Service or was clairvoyant, Stansfield surely was not aware that a file had been opened.  And since nothing else of a federal investigative nature had occurred, Stansfield could not have known that a federal investigation (if that's what opening a file is) was in the works.

On the record before us, therefore, there is simply no way to conclude that Stansfield either believed that a federal investigation was underway or could possibly have been aware of the potential for a federal investigation.  While it is easy for those of us versed in the federal law to conclude, as the majority does, that "the underlying offense clearly was a federal offense[,]" id.at 25, Stansfield is neither a lawyer nor a judge, and the government has yet to demonstrate, even remotely, that Stansfield had reason to believe that the underlying offense was federal in nature, or had reason to believe that Hoffman might have talked to

"an officer or employee of the federal government" (which he had not), or might do so in the future.  He could not possibly have intended to frustrate a communication he had no reason to believe might occur, to a person he had no reason to believe existed.

Despite the majority's protestations to the contrary, the effect of the majority's construction and application of this important statute is not only to diminish, but as a practical matter to remove, the government's burden of proof.  Unlike the cases on which the majority relies, here the government did not prove that Stansfield believed or was aware of the possibility or existence of a federal investigation, yet the majority finds that lack of proof irrelevant because, once again, it can be "inferred" from the fact that Stansfield's underlying offense just happened to be a federal offense.  To relieve the government of its burden of proving an important element of a criminal offense is a serious step, and I believe the majority's approach here is seriously out of step with both the case law and the statute.

I would enter a judgment of acquittal on Count XI.  I concur in the remainder of the majority opinion.