PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

NAKIE HARRIS,
*Defendant-Appellant.*

No. 06-4232

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

RICHARD ROYAL,
*Defendant-Appellant.*

No. 06-4233

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

TERRENCE SMITH,
*Defendant-Appellant.*

No. 06-4234

Appeals from the United States District Court
for the District of Maryland, at Baltimore.
J. Frederick Motz, District Judge.
(1:05-cr-00061-JFM-1; 1:05-cr-00061-JFM-5; 1:05-cr-00061-JFM-6)

Argued: May 25, 2007

Decided: August 22, 2007

Before TRAXLER and KING, Circuit Judges, and
T. S. ELLIS, III, Senior United States District Judge
for the Eastern District of Virginia, sitting by designation.

---

Affirmed in part and vacated and remanded in part by published opinion. Judge Traxler wrote the opinion, in which Judge King and Senior Judge Ellis joined.

---

## COUNSEL

**ARGUED:** Martin Gregory Bahl, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Baltimore, Maryland, for Appellants. Kwame Jangha Manley, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee. **ON BRIEF:** James Wyda, Federal Public Defender, Greenbelt, Maryland, Denise C. Barrett, Assistant Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Baltimore, Maryland; Randolph Gregory, Sr., Baltimore, Maryland; Mary E. Davis, Washington, D.C., for Appellants. Rod J. Rosenstein, United States Attorney, A. David Copperthite, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee.

---

## OPINION

TRAXLER, Circuit Judge:

Nakie Harris, Richard Royal, and Terrence Smith (Appellants) appeal their convictions for several crimes relating to the firebombing of Edna McAbier's home to prevent her from continuing to contact law enforcement regarding the sale of illegal drugs in her area. Smith also appeals his sentence. We affirm Appellants' convictions but vacate Smith's sentence and remand for resentencing.

I.

On January 15, 2005, at about 1:30 a.m., McAbier was lying on the couch in her home when she heard several "thuds" on her roof. J.A. 97. Scared, she jumped up, grabbed her telephone, and walked toward her front window. As she approached the window, she could smell gasoline, and she realized what was happening: Gang members were firebombing her house.

At the time of the attack, McAbier was serving as president of the Harwood Community Association and had lived in the Baltimore, Maryland, community for more than 30 years. In the last several years, the neighborhood had declined as crime and drugs became increasingly prevalent. McAbier had begun emailing and telephoning Baltimore City Police concerning drug-related activity in her neighborhood. As a result of these communications, in 2003 McAbier began to suffer retaliation in various forms. Her door was spray painted, her steps urinated upon, and her flowers torn up. Subsequently, her car was scratched, drawn on with magic markers, and pelted with food. Her tires were slashed and "bitch" was scratched on the trunk of her car. Because of these events, the Baltimore City Police began sending officers to McAbier's house, bringing McAbier a reprieve that lasted until her home was firebombed.

On the night before the attack, Terrence Smith, the leader of a group of the "Bloods" gang, called a meeting at his house and announced that he wanted to bomb McAbier's house because McAbier was calling the police too much and interfering with the Bloods' drug dealing in that area. After the meeting, Andre Wilkins drove Brian Harrison, Cedric Bowman, Jackie Brewington, Harris,[1] Royal, and Isaac Smith (no relation to Terrence Smith) in his minivan to two different gas stations to purchase gasoline and lighters. At the second gas station, Royal exited the van, went to a bar across the street, and purchased six bottles of beer. Wilkins then drove the men to a house where they emptied the beer bottles. Harris proceeded to soak rags in the gasoline, pour gasoline into the bottles, twist the rags, and place them in the bottles. Wilkins had another person call the

---

[1]Harris was not a member of the Bloods, but he supplied drugs to several Bloods members to sell.

police and report a crime to direct them away from McAbier's home. After Wilkins received word that the call had been made, each of the other six men took a bottle. Harris and Isaac Smith went to the front of McAbier's home, and Royal, Bowman, Brewington, and Harrison went to the back. They lit their gasoline-filled bottles and threw them at McAbier's home, scorching its exterior, the outer landing, and the sidewalk. They then fled the scene.

Appellants were subsequently indicted for one count of conspiring to commit witness tampering, *see* 18 U.S.C.A. § 371 (West 2000), two substantive counts of witness tampering, *see* 18 U.S.C.A. § 1512(a)(1)(C), (a)(2)(C) (West 2000 & Supp. 2007), one count of using a firearm during and in relation to a crime of violence, *see* 18 U.S.C.A. § 924(c) (West Supp. 2007), one count of using fire or an explosive to commit a felony, *see* 18 U.S.C.A. § 844(h)(1) (West 2000), and one count of manufacturing a firearm, *see* 26 U.S.C.A. § 5861(f) (West 2002).

At trial, the government presented testimony from several witnesses to the events of the morning of the firebombing and the night before, including Wilkins, Brewington, and Isaac Smith. Royal and Harris moved unsuccessfully to sever their trial from Smith's when the government moved to introduce a DVD depicting Bloods gang members wearing gang colors and making gang hand signs and Smith speaking about the importance of not "snitching" to the police.

At the close of the government's evidence, Appellants moved for a judgment of acquittal on all counts. As is relevant here, they maintained that the government had failed to establish the federal nexus required to prove the witness tampering offenses because the government failed to show that McAbier had contacted *federal* authorities or was likely to do so. The government took the position that the federal nexus was established as a matter of law by virtue of the fact that drug trafficking is a federal offense. After much debate, the district court denied Appellants' motion and granted a motion by the government to reopen its case to present evidence regarding the likelihood that the crimes that McAbier complained about would have been referred to federal authorities. The district court denied a request by defense counsel for discovery, ruling that the "issue ha[d] been present the whole time" and that the government would not be presenting any

expert testimony. J.A. 558. The court also ruled that it would not "allow contrary evidence in rebuttal" although it would allow cross-examination of the government's witness. J.A. 562. The government then presented the testimony of Special Agent Robert Brisolari of the Drug Enforcement Administration (DEA). Brisolari testified that the Baltimore City Police Department was the "biggest source" of their information and that it contributes the most officers to DEA task force groups. J.A. 576. He went on to testify that the DEA sometimes accepts cases that "are considered street level trafficking." J.A. 580.

Following closing arguments, the district court instructed the jury regarding the applicable law. With regard to the witness tampering counts, the court charged that to establish the necessary mens rea, the government must prove that Appellants "acted knowingly and with the unlawful intent to induce Mrs. McAbier to hinder, delay, or prevent the communication of information to a law enforcement officer of the United States." J.A. 708. Contrary to Appellants' argument that the government was required to show that McAbier had contacted *federal* authorities or was likely to do so, the court instructed:

> In order to satisfy [the intent] element, it is not necessary for the government to prove that the defendant knew he was breaking any particular criminal law nor need the government prove that the defendant knew that the law enforcement officer is a federal law enforcement officer. *What the government must prove is that there was a possibility or likelihood that the information being provided by Ms. McAbier about drug activities would be communicated to a law enforcement officer of the United States, irrespective of the governmental authority represented by the officers to whom she personally communicated information.*

> Also, I shall instruct you that drug trafficking is a federal offense. Again, however, it is not necessary for the government to prove the defendant knew that drug trafficking is a federal offense. The law does not require that a federal proceeding be pending at the time or even that it was about to be initiated when the attempted action, threat, intimidation or corrupt persuasion was made, nor does the law require that the recipient of the intimidation must be involved in an

ongoing federal investigation or in an investigation of a federal crime.

J.A. 708-09 (emphasis added).

Appellants were subsequently convicted on all counts. Harris and Royal were each sentenced to 720 months' imprisonment. Smith received a 960-month sentence.

## II.

Appellants first challenge the validity of their witness tampering convictions.[2]

The code sections that Appellants were convicted of violating are part of the Victim and Witness Protection Act of 1982, as amended, which Congress enacted for three reasons: to protect the critical role that victims of crimes and witnesses to crimes play in the justice system, to protect those victims and witnesses both from criminals and from the negative effects of participating in the justice system, and to provide a model for state and local legislation. *See* Victim and Witness Protection Act of 1982 (VWPA), Pub. L. 97-291 § 2, 96 Stat. 1248, 1248-49 (1982) (Congressional Findings and Purposes) (codified as amended at 18 U.S.C.A. § 1512-15 (West 2000 & Supp. 2007)); *see also* 21st Century Department of Justice Appropriations Authorization Act, Pub. L. 107-273 § 3001, 116 Stat. 1758, 1803-04 (2002) (amending VWPA to add § 1512(a)(2) and redesignate former (a)(2) as (a)(3)). Appellants were convicted of one count of violating § 1512(a)(1)(C) and one count of violating § 1512(a)(2)(C). As is relevant here, § 1512(a)(1)(C) makes it a crime to "kill[ ] or attempt[ ] to kill another person, with intent to . . . prevent the communication to a law enforcement officer . . . of information relating to the commission or possible commission of a Federal offense . . . ." 18 U.S.C.A. § 1512(a)(1)(C). Section 1512(a)(2)(C) prohibits "us[ing or attempting to use] physical force or the threat of physical force

---

[2]Appellants maintain that this issue affects the validity not only of their witness tampering convictions but also their convictions for conspiracy, using a firearm during and in relation to a crime of violence, and using fire or an explosive to commit a felony.

against any person . . . with intent to . . . hinder, delay, or prevent the communication by any person to a law enforcement officer . . . of information relating to the commission or possible commission of a Federal offense . . . ." 18 U.S.C.A. § 1512(a)(2)(C). "Law enforcement officer" is defined both for § 1512, which is at issue here, and 18 U.S.C.A. § 1513, which concerns retaliatory obstructions of justice, as

> an officer or employee of the Federal Government, or a person authorized to act for or on behalf of the Federal Government or serving the Federal Government as an adviser or consultant—
>
> (A)  authorized under law to engage in or supervise the prevention, detection, investigation, or prosecution of an offense; or
>
> (B)  serving as a probation or pretrial services officer under this title.

18 U.S.C.A. § 1515(a)(4). Section 1512(g)(2) further provides that

> [i]n a prosecution for an offense under this section, no state of mind need be proved with respect to the circumstance . . . that the law enforcement officer is an officer or employee of the Federal Government or a person authorized to act for or on behalf of the Federal Government or serving the Federal Government as an adviser or consultant.

18 U.S.C.A. § 1512(g)(2).[3]

   Appellants do not dispute that the evidence here was sufficient to prove that they acted with the intent to prevent communication to Baltimore City Police about the commission or possible commission of a federal offense. Nevertheless, they point out that the evidence in the record established that in all the time McAbier was in contact with law enforcement concerning her complaints of drug activity in her

---

[3]Formerly 18 U.S.C.A. § 1512(f)(2).

neighborhood, she had communicated only with *local* police, who, in turn, had never referred her information to federal authorities. Appellants argue that, to prove the charged offenses, the government had to prove either that it *actually* is likely that had Appellants not interfered, McAbier would have communicated her information to a *federal* officer, or that Appellants *believed* that if they did not interfere, McAbier might communicate her information to a *federal* officer.

We review the correctness of jury charges concerning the elements of an offense de novo. *See United States v. Ellis*, 121 F.3d 908, 923 (4th Cir. 1997). "The elements of a criminal offense are as defined by the statutory language, which we interpret according to the traditional canons of statutory interpretation, including preeminently the plain meaning canon." *United States v. Johnson*, 114 F.3d 476, 482 (4th Cir. 1997).

## A.

Appellants' primary claim is that the government was required to prove that it *actually* was likely that had Appellants not interfered, McAbier would have communicated her information to a *federal* officer. Appellants claim to draw support for their interpretation of the relevant statutory language from *United States v. Perry*, 335 F.3d 316 (4th Cir. 2003), but we do not read *Perry* as supporting Appellants' reading. There, Perry challenged his conviction for witness tampering, in violation of 18 U.S.C.A. § 1512(b)(3) (West Supp. 2007), a statute requiring a mens rea identical to that required by § 1512(a)(2)(C).[4] Perry had been arrested by Montgomery County, Maryland police for various weapons violations stemming from his possession in his vehicle of, among other things, a loaded handgun

---

[4]Section 1512(b)(3) makes it unlawful, as is relevant here, to mislead another person with intent to "hinder, delay, or prevent the communication to a law enforcement officer . . . of information relating to the commission or possible commission of a Federal offense . . . ." 18 U.S.C.A. § 1512(b)(3) (West Supp. 2007). Because this mens rea requirement is identical to that of § 1512(a)(2)(C), and closely similar to that in § 1512(a)(1)(C), courts have often referred to cases interpreting § 1512(b)(3) when applying § 1512(a), and vice versa. *See, e.g.*, *United States v. Baldyga*, 233 F.3d 674, 680 n.5 (1st Cir. 2000).

with an obliterated serial number. *See Perry*, 335 F.3d at 318. Perry told the officers that if they would "throw away the gun," he would give them certain information. *Id.* (internal quotation marks omitted). Perry also lied to the officers about his name and birth date, and this conduct comprised the basis for his eventual § 1512(b)(3) conviction. *See id.* at 319.

Perry argued on appeal of his conviction that the government failed to prove that in lying to the MCPD about his name and birth date, he intended to prevent the communication of information to *federal* officers relating to the possible commission of a *federal* offense. *See id.* at 320. In analyzing this contention, we explained that the jurisdictional basis for § 1512(b)(3) is "the federal interest of protecting the integrity of potential federal investigations by ensuring that transfers of information to federal law enforcement . . . relating to the possible commission of federal offenses be truthful and unimpeded." *Id.* at 321 (internal quotation marks omitted, alteration in original). We concluded that the statute required the government only to "establish that the defendants had the intent to influence an investigation that happened to be federal." *Id.* (internal quotation marks omitted). We held that the government had met that standard because it showed that a portion of the potential investigation that Perry intended to impede—the "investigation into Perry's status as a felon in possession of a firearm"—was federal in nature. *Id.* Indeed, we noted that after MCPD officers learned Perry's true identity, they referred his case to federal authorities for a possible federal prosecution. *See id.* We thus determined that even though no federal investigation had begun at the time Perry committed his obstructive act and even assuming that he was not aware "that a portion of the firearms investigation would be federal," the government's evidence was sufficient to support his conviction. *Id.* at 321-22.

In so holding, we rejected Perry's argument that "the Government, in order to obtain a conviction . . ., was required to show that the MCPD was, at the time of the arrest, cooperating in an ongoing federal investigation or in the investigation of a federal offense." *Id.* at 322 n.9. We added that § 1512(b)(3) "does not require that . . . communication with federal officers be . . . imminent." *Id.* We also rejected Perry's suggestion that § 1512(b)(3) requires "that federal officials actually receive the misleading information," noting that the

statute "applies to one who engages in misleading conduct with an *intent* to 'hinder, delay, or prevent' communication with federal law enforcement officers. It does not require that the individual have succeeded." *Id.*

Appellants recognize that while Perry was charged with *providing misleading information* to authorities in violation of § 1512(b)(3), Appellants were charged with using force *with the intent to prevent communication of information* in violation of § 1512(a)(1)(C) and (a)(2)(C). In light of this distinction, Appellants concede that it would "make no sense [here] to require that the prevented communication actually be shared with a federal officer." Brief of Appellants at 39. Appellants nevertheless contend that the government was required to prove that "some of the information previously provided by Ms. Mc-Abier to the local police regarding the drug activity in her neighborhood [was] shared with some federal law enforcement officer." *Id.* Absent such proof, Appellants maintain, the evidence would not be sufficient to show that the investigation that Appellants intended to prevent "happened to be federal." This argument demonstrates a misunderstanding of *Perry*. In *Perry*, no actual federal investigation existed at the time Perry lied to the MCPD. Thus, when we held that the evidence was sufficient to prove that Perry lied with the intent to disrupt an investigation that happened to be federal, we were referring to a *potential* investigation relating to the information he sought to suppress. And, we determined that a portion of this *potential* investigation happened to be federal because Perry's firearm possession violated federal law. *See Perry*, 335 F.3d at 321. Similarly, Appellants were charged here with using force with the intention of disrupting McAbier's future communication of information relating to drug trafficking in her neighborhood. A portion of the potential investigation that they sought to prevent "happened to be federal" because drug trafficking is a federal offense. That McAbier had communicated previously with local law enforcement and that those communication had not spawned a federal investigation are red herrings here.

*Perry* aside, Appellants' argument fails for another reason. The statutes Appellants were charged with violating prohibit the commission of certain obstructive acts "with intent to" affect the communication to a law enforcement officer of information relating to the commission or possible commission of a federal offense. 18 U.S.C.A.

§ 1512(a)(1)(C), (a)(2)(C). Because the defendant need only "inten[d]" his obstructive actions to have that effect, the issue of whether the victim, in the absence of the tampering, would have *actually* communicated his information to *any* authority, *federal or otherwise*, is completely irrelevant to his guilt. *See United States v. Aguilar*, 515 U.S. 593, 599, 602 (1995) (explaining that a defendant can be guilty of "corruptly . . . endeavor[ing] to influence, obstruct, or impede" a grand jury proceeding by lying to a subpoenaed witness who ultimately is not called to testify or who does not transmit the defendant's account (internal quotation marks omitted)); *see Perry*, 335 F.3d at 322 n.9 (holding that the government need not prove that the defendant *successfully* hindered, delayed, or prevented communication with federal law enforcement to prove guilt under § 1512(b)(3), but only that he *intended* to do so). So long as the information the defendant seeks to suppress actually relates to the commission or possible commission of a federal offense, the federal nexus requirement is established.[5]

---

[5]Appellants also argue that even if the district court correctly instructed the jury that the government was required to prove only a "possibility" that the information that McAbier would have provided would have been communicated to federal authorities, *see United States v. Veal*, 153 F.3d 1233, 1250-51 (11th Cir. 1998), the government failed to do that. We disagree. The district court instructed the jury that drug trafficking is a federal offense. Regardless of the fact that McAbier had chosen in the past to contact only Baltimore City Police, the federal nature of the offense at issue at least created the *possibility* that she might have decided in the future to contact federal authorities. Similarly, although the local police had not referred to federal authorities information that McAbier had provided in the past, the federal nature of the offenses created the possibility that they would decide to refer future information. *See Black's Law Dictionary* 1203 (8th ed. 2004) (defining "possibility" as "[a]n event that may or may not happen"). *But see United States v. Lopez*, 372 F.3d 86, 92 (2d Cir. 2004) (holding that mere theoretical possibility was not sufficient when "no evidence in the record connect[ed that] possibility with reality"), *vacated for reconsideration on other grounds*, 544 U.S. 902 (2005).

Appellants also maintain that the district court erred in two additional ways: first, in allowing the government to reopen its case to present evidence on the *likelihood* that the Baltimore City Police would have referred information from McAbier to federal authorities, and second, in

B.

*Perry* and the applicable statutory language also foreclose Appellants' suggestion that the government was required to prove that they specifically *intended* to interfere with communication to *federal* officers. As we have noted, section 1512(g)(2) provides that

> [i]n a prosecution for an offense under this section, no state of mind need be proved with respect to the circumstance . . . that the law enforcement officer is an officer or employee of the Federal Government or a person authorized to act for or on behalf of the Federal Government or serving the Federal Government as an adviser or consultant.

18 U.S.C.A. § 1512(g)(2). This language clearly applies regardless of whether a defendant has contemplated any particular officer, federal or otherwise, with whom his victim might communicate.[6] Thus, under the plain meaning of the applicable statutory language, the govern-

---

refusing to allow Appellants to rebut this evidence. Assuming that the district court erred in either or both of these rulings, any error was clearly harmless. *See* Fed. R. Crim. P. 52(a) ("Any error . . . that does not affect substantial rights must be disregarded."). As we have explained, the government was not required to prove that the federal authorities would *likely* have received any information had Appellants not interfered. And, the evidence that Appellants claim they were denied the opportunity to present did not tend to negate the *possibility* that McAbier's information would eventually be communicated to federal authorities.

[6]Reading § 1512(g)(2) to apply only to a defendant who has contemplated a particular officer would produce absurd results. *See Aremu v. Dep't of Homeland Sec.*, 450 F.3d 578, 583 (4th Cir. 2006) (noting "settled rule that a court must, if possible, interpret statutes to avoid absurd results"). For example, under such a reading, a defendant who killed a witness to prevent her from communicating with any law enforcement officer, without contemplating any particular officer, could not be prosecuted, since (g)(2) would not apply and he would lack the intent to affect communication with a *federal* officer; yet, the same defendant could be prosecuted if he intended to affect communication with a particular *state* officer because § 1512(g)(2) would apply and excuse the government from proving a belief that the affected officer would be *federal*.

ment need not prove any state of mind regarding whether the potential investigation that a defendant sought to affect would be conducted by *federal* officers. *See Perry*, 335 F.3d at 321-22; *United States v. Davis*, 932 F.2d 752, 761 (9th Cir. 1991) (holding that § 1512 did not require proof that defendant knew the federal nature of the investigation with which he was interfering); *United States v. Scaife*, 749 F.2d 338, 348 (6th Cir. 1984) (rejecting argument that § 1512 required proof that defendant knew that witness was going to testify before federal grand jury or that he was trying "to communicate information regarding a federal offense to a federal law enforcement officer" and holding that § 1512 only "requires the government to prove knowing use of, or a knowing attempt to use, intimidation or physical force").[7]

*Perry* and the plain language of § 1512(g)(2) notwithstanding, Appellants maintain that *Arthur Andersen LLP v. United States*, 544 U.S. 696 (2005), supports their reading of the statute. Their reliance is misplaced, however. In *Arthur Andersen*, the Court considered the proof necessary to demonstrate under 18 U.S.C.A. § 1512(b)(2)(A) and (B) (West 2000) a defendant's guilt of "knowingly . . . corruptly persuad[ing] another person . . . with intent to . . . cause" that person to "withhold" documents from, or "alter" documents for use in, an "official proceeding." *Arthur Andersen*, 544 U.S. at 703 (internal quotation marks omitted, second alteration added). At issue was whether Enron Corporation's auditor, Arthur Andersen, knowingly corruptly persuaded its employees within the meaning of § 1512(b) when it instructed them to destroy documents pursuant to its then-existing document retention policy after Enron's financial difficulties became public. *See id.* at 698. The Court held, as is relevant here, that "[a] 'knowingly . . . corrup[t] persuade[r]' cannot be someone who persuades others to shred documents under a document retention policy when he does not have in contemplation any particular official proceeding in which those documents might be material." *Id.* at 708 (alterations in original).

---

[7]Supporting Appellants' position is *United States v. Edwards*, 36 F.3d 639 (7th Cir. 1994), which held that proving guilt under § 1512(a)(1)(C) requires proof that "the defendant *believed* that a person might furnish information to federal officials." *Id.* at 645 (emphasis in original). *Edwards* is unpersuasive, however, as it simply relies on a case interpreting 18 U.S.C.A. § 1510 (West 2000 & Supp. 2007), which contains no language comparable to § 1512(g)(2). *See Edwards*, 36 F.3d at 645.

*Arthur Andersen* has no application to the crimes charged in the present case, however. Simply put, the statutory language at issue here is completely different than that which the *Arthur Andersen* Court interpreted. Most elementally, § 1512(g)(2), which specifically excuses the government from proving any state of mind of the defendant with regard to whether the communication interference will be with *federal* officers, has no application to § 1512(b)(2)(A) and (B). In any event, Congress clearly did not intend that a defendant, to be guilty of the crimes at issue here, would need to contemplate a "particular" officer from whom he hoped to keep the victim's information.[8]

Appellants also maintain that requiring proof of a defendant's awareness of the likelihood that the victim would have communicated with federal authorities absent the defendant's interference is necessary to avoid making surplusage of the portion of § 1515(a)(4) that defines "law enforcement officer" in part as "an officer or employee of the Federal Government, or a person authorized to act for or on behalf of the Federal Government or serving the Federal Government as an adviser or consultant." *See United States v. Childress*, 104 F.3d 47, 52 (4th Cir. 1996) ("A well-recognized canon of construction requires courts to read statutory provisions so that, when possible, no part of the statute is superfluous."). The claim that our reading makes surplusage out of this language is simply not correct. Although § 1512(g)(2) essentially negates any effect *in § 1512* of that part of the definition contained in § 1515(a)(4), the definition also applies to § 1513, which, as is relevant here, criminalizes various conduct undertaken "with intent to retaliate" against any person for providing information relating to the commission of a federal, or possible fed-

---

[8]If anything, *Arthur Andersen* might be relevant to the question of whether a defendant, to be guilty of the crimes at issue here, must have some particular state of mind with regard to whether the information he sought to suppress related to the commission or possible commission of a federal crime. *But see United States v. Feola*, 420 U.S. 671, 677 n.9 (1975) ("[T]he existence of the fact that confers federal jurisdiction need not be one in the mind of the actor at the time he perpetrates the act made criminal by the federal statute."); *Perry*, 335 F.3d at 321-22 ("Whether Perry was aware that a portion of the firearms investigation would be federal is irrelevant."). We do not address this question, however, as Appellants' argument concerns only the federal officer requirement.

eral, offense to a "law enforcement officer." 18 U.S.C.A. § 1513(a)(1)(B) (West Supp. 2007). Because § 1513 contains no provision equivalent to § 1512(g)(2) that would negate the effect of the identified portion of the definition of "law enforcement officer," no portion of the definition is superfluous.

C.

We recognize that Appellants' interpretation of § 1512(a)(1)(C) and (a)(2)(C) is not without support from some decisions from other circuits. In *United States v. Stansfield*, 101 F.3d 909 (3d Cir. 1996), the Third Circuit held that to obtain a conviction under 18 U.S.C.A. § 1512(a)(1)(C), the government must prove that

> (1) the defendant killed or attempted to kill a person; (2) the defendant was motivated by a desire to prevent the communication between any person and law enforcement authorities concerning the commission or possible commission of an offense; (3) that offense was actually a federal offense; and (4) the defendant believed that the [victim] might communicate with the *federal* authorities.

*Id.* at 918 (emphasis in original). The court held that the fourth element "may be inferred by the jury from the fact that the offense was federal in nature, plus additional appropriate evidence [such as evidence] that the defendant had actual knowledge of the federal nature of the offense." *Id.* The court explained that its framework was "an appropriate reconciliation between the constraint that the government must prove the defendant's specific intent to hinder a *federal* investigation and the fact that, by virtue of [§ 1512(g)(2)], it need not prove that the defendant knew the federal status of any particular law enforcement officer involved in an investigation." *Id.* at 919.

In *United States v. Bell*, 113 F.3d 1345 (3d Cir. 1997), the court clarified *Stansfield*'s rule. Despite the fact that the fourth element as described in *Stansfield* clearly concerned the subjective belief of the defendant, the *Bell* court recognized that such an interpretation of the applicable statutory language could not be squared with § 1512(g)(2). *See id.* at 1349. Accordingly, the court refused to read *Stansfield* "as requiring proof that the defendant believed the victim might commu-

nicate with law enforcement officers *whom the defendant knew or believed to be federal officers.*" *Id.* (emphasis in original). Rather, the court read it "as recognizing that what the statute mandates is proof that the officers with whom the defendant believed the victim might communicate *would in fact be federal officers.*" *Id.* (emphasis in original). The court explained that, as *Stansfield* had announced, proof of the fourth element could be evidence of the defendant's knowledge that the information he sought to suppress concerned a federal offense, as long as the government also presented "additional appropriate evidence." *Id.* (internal quotation marks omitted).[9] The court did not attempt to explain how its interpretation could be reconciled with the applicable statutory language.

Viewing *Stansfield* and *Bell* together, we conclude that the genesis of *Bell*'s requirement that the government prove that the officers with whom the defendant believed the victim might communicate would in fact be federal officers was not the applicable statutory language, but rather, the *Stansfield* court's mistaken belief that the government was required to prove a subjective belief by the defendant that "the [victim] might communicate with the federal authorities," *Stansfield*, 101 F.3d at 918, and the *Bell* court's attempt to reduce the effect of that erroneous conclusion. Unlike the *Bell* court, we are not bound by the interpretation announced in *Stansfield* and need not allow conclusions in that opinion that we do not find persuasive to affect our own analysis of the statute.[10]

---

[9]Several other circuits have followed *Bell* and *Stansfield*. *See United States v. Rodriguez-Marrero*, 390 F.3d 1, 13 (1st Cir. 2004); *United States v. Causey*, 185 F.3d 407, 422-23 (5th Cir. 1999); *United States v. Diaz*, 176 F.3d 52, 91 (2d Cir. 1999).

[10]We recognize, of course, that the case we quoted in *Perry* for the proposition that § 1512(b)(3) requires only "'that the government establish that the defendants had the intent to influence an investigation that happened to be federal'" was a Third Circuit case applying *Bell* and *Stansfield*. *See Perry*, 335 F.3d at 321 (citing *United States v. Applewhite*, 195 F.3d 679, 687 (3d Cir. 1999)). As we have explained, however, we did not decide in *Perry* that the government, to meet that standard, was required to prove anything more than the federal nature of the offense to which the information in question pertained.

### D.

Appellants suggest that Congress lacked the power to enact § 1512(a)(1)(C) and (a)(2)(C) if the offenses do not include the elements Appellants have identified. Although Appellants have likely waived this argument by presenting it in wholly conclusory fashion,[11] *see* Fed. R. App. P. 28(a)(9)(A) (noting that Appellant's brief must contain "contentions and the reasons for them"); *11126 Baltimore Blvd., Inc. v. Prince George's County, Md.*, 58 F.3d 988, 993 n.7 (4th Cir. 1995) (en banc) (holding that arguments not discussed in appellate briefs are deemed abandoned), even assuming it is properly before us, we hold that Congress did not exceed its authority.

The Necessary and Proper Clause authorizes Congress "[t]o make all Laws which shall be necessary and proper for carrying into Execution" its Article I powers. U.S. Const. art. I, § 8, cl. 18. This Clause authorizes "legitimate" legislation that is "plainly adapted" to a constitutional end. *M'Culloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 421 (1819). An element of a crime sufficiently creates a federal jurisdictional nexus if it "implicates factors that are an appropriate subject for federal concern." *United States v. Feola*, 420 U.S. 671, 676 n.9 (1975); *see United States v. Worrall*, 2 U.S. (2 Dall.) 384, 394 (1798) (explaining that Congress is authorized to "create, define, and punish crimes and offenses, whenever they shall deem it necessary and proper by law to do so, for effectuating the objects of the government"). "[T]he existence of the fact that confers federal jurisdiction need not be one in the mind of the actor at the time he perpetrates the act made criminal by the federal statute." *Feola*, 420 U.S. at 677 n.9. In *Feola*, the Court held that to prove the offense of assault on a federal officer in violation of 18 U.S.C.A. § 111, the government need

---

[11]Appellants argue that

> permitting a federal obstruction conviction to rest on nothing more than proof that the victim *might have* communicated with federal law enforcement officers, regardless of whether the victim's information *would in fact have been communicated to federal officers*, is contrary to the limited criminal jurisdiction of the federal courts . . . .

Brief of Appellants at 42 (emphasis in original).

prove only that the defendant acted with criminal intent to assault a person who happened to be a federal officer and need not prove that the defendant was aware that the victim was a federal officer. *See id.* at 684. The Court concluded that Congress's goals in enacting § 111 were to protect federal officers as well as federal law enforcement activities and that not requiring knowledge by the defendant that the victim was a federal officer served both goals. *See id.* at 678-79.

Similar reasoning dictates that Congress acted within its powers in enacting § 1512. The jurisdictional basis for § 1512(a)(1)(C) and (a)(2)(C) is the federal interest in enhancing and protecting the critical role that witnesses play in the federal criminal justice process and protecting those witnesses themselves. *See* Pub. L. 97-291 § 2, 96 Stat. at 1248-49; *see Applewhite*, 195 F.3d at 688 ("It is the integrity of the process and the safety of those involved that Congress was seeking to protect in enacting § 1512."). Clearly, threats and uses of force against witnesses, executed with the intent to suppress information relating to the commission or possible commission of federal crimes, constitute direct assaults on this interest. Congress was therefore authorized to enact § 1512(a)(1)(C) and (a)(2)(C), as those subsections are written, without including the additional elements that Appellants would have us read into the statute. *See Feola*, 420 U.S. at 676 n.9 ("[W]here Congress seeks to protect the integrity of federal functions and the safety of federal officers, the interest is sufficient to warrant federal involvement."); *cf. United States v. Tyler*, 281 F.3d 84, 92-93 (3d Cir. 2002) (rejecting argument that § 1512 exceeds Congress' authority under the Necessary and Proper Clause to the extent it allows convictions "when no federal proceeding is contemplated and when a victim did not intend to cooperate with a federal officer").

### III.

Royal and Harris next argue that the district court erred in denying their motion to sever their trial from Smith's when the government introduced a particular DVD. One segment of the DVD showed Bloods members wearing gang colors and making gang hand signs. Another depicted Smith speaking about drug dealing and the importance of not "snitching" to the police. Royal and Harris maintain that the admission of the DVD prejudiced them because it was "replete

with profanity, vulgarities, threats and total depravity." Brief of Appellants at 44. We find no error.

When defendants have been properly joined, severance is proper "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 538 (1993). Absent special circumstances, defendants indicted together should be tried together, *see United States v. Brugman*, 655 F.2d 540, 542 (4th Cir. 1981), and this presumption is especially strong in conspiracy cases, *see United States v. Chorman*, 910 F.2d 102, 114 (4th Cir. 1990). We review a district court's decision to deny a motion to sever for abuse of discretion, *see United States v. Jones*, 356 F.3d 529, 535 (4th Cir. 2004), which we will find "only where the trial court's decision to deny a severance deprives the defendants of a fair trial and results in a miscarriage of justice," *Person v. Miller*, 854 F.2d 656, 665 (4th Cir. 1988) (alteration & internal quotation marks omitted).

Here, the segment showing Smith speaking about "snitching" and drug dealing was admitted against Smith only. The district court admitted the second segment to show "general relationships" between the gang members. J.A. 257. In order to minimize any unfair prejudice, the court instructed the jury regarding the limited purpose of the DVD's admissibility and added that "there's absolutely no evidence that either Mr. Harris or Mr. Royal appears in any of the scenes . . . of the DVD." J.A. 257.

Although Appellants maintain that "allowing the jury to consider any part of the video as evidence against them was improper," Brief of Appellants at 47, they offer no reason why the behavior captured on tape would be particularly prejudicial to them, especially since the jury was specifically instructed that there was no evidence that they appeared in the video. Moreover, we know of no reason why any prejudice to them from the video would have affected their opportunity to receive a fair trial. We therefore hold that the district court acted within its discretion in denying their motion.

IV.

Appellants next contend that the district court committed plain error in allowing improper rebuttal argument from the government. We disagree.

Royal's defense counsel argued in closing that the prosecutor had essentially blamed Appellants for the decline of McAbier's neighborhood, "like Martians came in and took over the area." J.A. 602. Counsel contended that the prosecutor was "demonizing" Royal and "making him look like a . . . monster . . . so that [the jury could] convict him without feeling bad about it." J.A. 611. He argued that what had happened in the neighborhood was terrible, but there would be "no winners in this case" regardless of whether Appellants were found guilty. J.A. 603-04. The prosecutor responded on rebuttal:

> [Royal's counsel] mentioned that . . . these aren't Martians that attacked the community. Well, I agree with that. But they are a cancer on the community. Drug dealing, violent drug dealing, these defendants were involved in that. They were involved in the violence. They're involved in the drug trafficking.
>
> He said no winners in this case. I think that's absolutely wrong. I think there's [a] winner sitting right up there. Ms. Edna McAbier is a winner in this case. And justice will prevail in this case. It is for you to decide, justice will prevail in this case.
>
> We have to send a message back to the people, can't do this any more, it's not acceptable, we won't stand for this.

J.A. 671-72.

Appellants maintain that the prosecutor's argument was improper because it "could suggest to the jury that they should convict the defendants not for their participation in [the charged] crimes, but merely to make a statement against narcotics crimes in general or to prevent future crimes." *United States v. Pupo*, 841 F.2d 1235, 1240

(4th Cir. 1988) (en banc). They also contend that the argument was misleading because "Appellants were not charged with drug dealing" and "[t]he argument was an attempt . . . to take the jury's focus off the charged offenses." Brief of Appellants at 49.

Because Appellants made no contemporaneous objection to the argument they now challenge, we review for plain error only. *See* Fed. R. Crim. P. 52(b); *United States v. Olano*, 507 U.S. 725, 732-35 (1993). In order to prevail under that standard, Appellants must show that an error occurred and that the error was plain and affected their substantial rights. *See Olano*, 507 U.S. at 732. Even if they succeed in making such a showing, we would not exercise our discretion to correct the error unless the error "seriously affected the fairness, integrity, or public reputation of judicial proceedings." *United States v. Higgs*, 353 F.3d 281, 324 (4th Cir. 2003).

Whether improper argument by the government has prejudiced the trial process to such a degree as to require reversal depends on the facts of each trial. *See United States v. Harrison*, 716 F.2d 1050, 1051 (4th Cir. 1983). In determining whether such improper remarks require reversal we consider:

> (1) the degree to which the prosecutor's remarks have a ten-dency to mislead the jury and to prejudice the accused; (2) whether the remarks were isolated or extensive; (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the accused; and (4) whether the com-ments were deliberately placed before the jury to divert attention to extraneous matters.

*Id.* at 1052.

We conclude there was nothing improper about the prosecutor emphasizing Appellants' drug dealing because drug dealing was an important part of the trial even though drug offenses were not charged. It was information concerning drug dealing that Appellants were attempting to prevent McAbier from communicating to law enforcement; thus, emphasizing Appellants' status as drug dealers was certainly appropriate in response to the argument that Appellants were being unfairly "demoniz[ed]."

The "send a message" comment was at least arguably improper for the reason urged by Appellants, however. Even so, it clearly does not justify reversal of Appellants' convictions. The case against Royal here was strong and the remark at issue was isolated. There is no indication that it was a deliberate attempt on the part of the prosecutor to remove the jury's attention from the legal issues before it. Indeed, in his relatively short rebuttal, the prosecutor repeatedly admonished the jury to decide the case before it and not allow itself to get distracted by extraneous issues. *See, e.g.*, J.A. 667 ("Stay focused on the evidence. Stay focused on the facts and focused on the testimony."); J.A. 675 ("You decide this case on the facts and the evidence . . . ."). Under these circumstances, we conclude that "the degree to which the remarks could have misled and prejudiced the jury was relatively small," and thus, reversal is not warranted. *Pupo*, 841 F.2d at 1240.

V.

Smith finally argues that the district court failed to properly justify its 187-month variance from the applicable guidelines range. Calculating the appropriate sentencing guidelines range for Smith, the district court determined the base offense level to be 33 since the object of the offense would have constituted first degree murder. *See* U.S.S.G. § 2A2.1(a)(1) (2005). That level and a Criminal History Category of VI yielded a range of 235-293 months' imprisonment.[12] The court then added a 360-month mandatory minimum consecutive penalty based on Smith's use of a destructive device during and in relation to a crime of violence. *See* 18 U.S.C.A. § 924(c)(1)(B)(ii); U.S.S.G. § 4B1.1(c)(2)(A), resulting in a range of 595-653 months. Finally, the court also added a 120-month consecutive sentence for Smith's use of fire or an explosive to commit a felony, resulting in a final guidelines range of 715-773 months. *See* 18 U.S.C.A. § 844(h)(1); U.S.S.G. § 2K2.4(a). Noting the serious nature of the crime, and citing the need to protect the community, the district court imposed a variance sentence of 960 months.

---

[12]The court also determined that Smith was a career offender, *see* U.S.S.G. § 4B1.1(a), but that determination did not affect his offense level or his Criminal History Category.

*United States v. Booker*, 543 U.S. 220 (2005), which rendered the federal sentencing guidelines advisory, effected a significant change in the way that federal sentences are determined, leaving much uncertainty in its wake. Since *Booker* was issued, and since the district court sentenced Smith, we have decided many important issues regarding how the advisory sentencing guidelines scheme should be applied, including the process courts must employ in incorporating the advisory guideline range into its analysis of what sentence to impose, *see United States v. Moreland*, 437 F.3d 424, 432-33 (4th Cir.), *cert. denied*, 126 S. Ct. 2054 (2006), and whether courts should continue to consider the appropriateness of departures in determining the defendant's advisory guidelines range, *see United States v. Danvenport*, 445 F.3d 366, 372 n.2 (4th Cir. 2006), both of which bear on Smith's sentence. In order to give the district court the benefit of these and other recent decisions, we vacate Smith's sentence and remand for reconsideration. In so doing, we make no comment on the reasonableness of the sentence imposed.

## VI.

In sum, we affirm Appellants' convictions but vacate Smith's sentence and remand for resentencing.

*AFFIRMED IN PART AND*
*VACATED AND REMANDED IN PART*