******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

## STATE OF CONNECTICUT *v.* LUIS E. COLON
## (AC 46428)

Bright, C. J., and Cradle and Seeley, Js.*

*Syllabus*

Convicted, following a jury trial, of possession of a controlled substance and operation of a motor vehicle while having an elevated blood alcohol content, the defendant appealed. The defendant claimed, inter alia, for the first time on appeal, that the state improperly joined the two offenses into a single information because they were not offenses of the same character and that the trial court's failure to sever them, sua sponte, constituted plain error. *Held*:

The trial court's failure to sever the offenses, sua sponte, did not constitute plain error, as the remedy to the purportedly improper joinder was available to the defendant via a motion to sever pursuant to the rule of practice (§ 41-18), and there was no obligation on the court to consider what might have been a tactical choice by the defendant or his counsel not to pursue a motion to sever.

The jury had ample evidence to conclude beyond a reasonable doubt that the defendant operated his motor vehicle with an elevated blood alcohol content in violation of statute (§ 14-227a (a) (2)), including the testimony of the arresting officer, body camera footage of the defendant's failed field sobriety tests, the results of the defendant's two breath tests, and expert testimony thereon.

Argued October 21, 2024—officially released April 22, 2025

*Procedural History*

Substitute information charging the defendant, under two docket numbers, with one count each of the crimes of possession of a controlled substance and operating a motor vehicle while having an elevated blood alcohol content, brought to the Superior Court in the judicial district of Tolland, geographical area number nineteen, and tried to a jury before *M. Murphy, J.*; verdicts and judgments of guilty, from which the defendant appealed to this court. *Affirmed.*

---

* The listing of judges reflects their seniority status on this court as of the date of oral argument.

*Vishal K. Garg*, assigned counsel, for the appellant (defendant).

*Linda F. Rubertone*, senior assistant state's attorney, with whom, on the brief, were *Matthew Gedansky*, state's attorney, and *Katelyn E. MacKinnon*, deputy assistant state's attorney, for the appellee (state).

*Opinion*

BRIGHT, C. J. The defendant, Luis E. Colon, appeals from the judgments of conviction, rendered following a jury trial, of possession of a controlled substance in violation of General Statutes § 21a-279 (a) (1)[1] (count one) and operation of a motor vehicle while having an elevated blood alcohol content in violation of General Statutes § 14-227a (a) (2)[2] (count two). The defendant claims that (1) the trial court committed plain error in failing, sua sponte, to sever the two offenses joined in the same information and (2) the evidence was insufficient to support his conviction with respect to count

[1] General Statutes § 21a-279 (a) (1) provides: "Any person who possesses or has under such person's control any quantity of any controlled substance, except any quantity of cannabis, as defined in section 21a-420, and except as authorized in this chapter or chapter 420f, shall be guilty of a class A misdemeanor."

Although the legislature has amended § 21a-279 (a) (1) since the events at issue; see Public Acts, Spec. Sess., June, 2021, No. 21-1, § 2; that amendment has no bearing on the merits of this appeal. In the interest of simplicity, we refer to the current revision of the statute.

[2] General Statutes § 14-227a (a) provides in relevant part: "No person shall operate a motor vehicle while under the influence of intoxicating liquor or any drug or both. A person commits the offense of operating a motor vehicle while under the influence of intoxicating liquor or any drug or both if such person operates a motor vehicle . . . (2) while such person has an elevated blood alcohol content. For the purposes of this section, 'elevated blood alcohol content' means a ratio of alcohol in the blood of such person that is eight-hundredths of one per cent or more of alcohol, by weight . . . ."

Although the legislature has amended § 14-227a since the events at issue; see Public Acts, Spec. Sess., June, 2021, No. 21-1, §§ 116 and 117; those amendments have no bearing on the merits of this appeal. In the interest of simplicity, we refer to the current revision of the statute.

two. We disagree and, accordingly, affirm the judgments of the court.

The following facts, which the jury reasonably could have found, and procedural history, are relevant to our disposition of the defendant's claims. On March 10, 2020, at approximately 5:30 p.m., the defendant was driving east on I-84 in the Tolland area. The highway in that area consists of three lanes and is considered a limited access highway with on and off ramps. At that time, the highway was experiencing medium to heavy traffic. The defendant was driving ahead of Toby Rutkowski,[3] a trooper with the Connecticut State Police, who was patrolling the area in his police cruiser. The defendant was traveling in the far left travel lane and abruptly crossed into the center lane and then crossed again into the right lane. The defendant then immediately exited the highway into the Willington rest area. At no point did the defendant use a turn signal.

Rutkowski followed the defendant and initiated a traffic stop by activating his overhead emergency lights at the beginning of the exit ramp but the defendant continued driving down the entire exit ramp and entered the rest area before bringing the vehicle to a complete stop. Immediately after the vehicle stopped, the defendant opened the driver's side door and attempted to exit the vehicle. Rutkowski instructed the defendant to stay inside the vehicle, and the defendant returned to the driver's seat. Rutkowski then approached the driver's side door, where the defendant was seated. Rutkowski was able to observe the defendant reaching underneath the driver's seat and toward the passenger area. When Rutkowski opened the driver's side door and requested that the defendant step out of the car, he observed a beer can tucked underneath the driver's seat. The defendant stepped out of

---

[3] Throughout the trial court record, Rutkowski's name is occasionally spelled as Rudkowski, Ruszkowski, or Rykwoski.

the car and, at Rutkowski's instruction, walked behind the vehicle and stood there.

While they were standing there, Rutkowski asked the defendant, "What's going on today?" The defendant responded that he felt tired and indicated that he understood why he had been pulled over. When Rutkowski asked the defendant for his driver's license, the defendant explained that his driver's license was expired but stated that he did have another form of identification in the glove compartment of his vehicle. The defendant began to walk to the passenger side of his vehicle to get his identification and opened the passenger side door. Rutkowski informed the defendant that he would retrieve the identification himself, told the defendant not to go in the glove compartment, and guided him back to stand behind the defendant's vehicle. Rutkowski asked the defendant if he could pat him down, to which the defendant consented.

While engaging with the defendant, Rutkowski smelled alcohol on the defendant's breath and noticed that the defendant was slurring his words and that his eyes were bloodshot and glassy. Rutkowski asked the defendant if he had anything to drink that day, prompting the defendant to inform him that he had a beer earlier and that he was on medication that was to be taken when he was not drinking. Rutkowski asked the defendant if he was okay to drive. The defendant stated, "matter of fact, I was going to pull in here to call my wife so she could come and pick me up because I can't drive." At this point, Rutkowski went back to the open passenger side door of the vehicle and picked up a wallet from the passenger seat that the defendant said contained his identification. While Rutkowski opened the defendant's wallet to find his identification, the defendant again informed him that his license had expired. Rutkowski asked the defendant if there was anything illegal in the car and the defendant replied: "You will probably find

some [co]caine that the fucking guy left in the car." The defendant further claimed that the cocaine belonged to his coworkers. When Rutkowski asked the defendant again what was in the car, the defendant again stated: "Some cocaine and shit." He told Rutkowski that the cocaine was in the glove compartment. Rutkowski then walked back to the open passenger side door, searched through the passenger side area, and saw a small, plastic container in the glove compartment, which was later determined to contain 0.037 grams of cocaine.

Thereafter, Rutkowski administered three field sobriety tests to determine whether the defendant's ability to operate a motor vehicle was impaired: the horizontal gaze nystagmus test,[4] the walk and turn test,[5] and the one leg stand test.[6] Prior to commencing the tests, Rutkowski ascertained that the defendant was not wearing contact lenses or glasses and was physically capable of performing both the walk and turn test and the one leg stand test. Before administering each test, Rutkowski explained to the defendant what he was required to do, and the defendant indicated that he understood.

The defendant did not perform any of the tests to standard. Specifically, during the horizontal gaze nystagmus test, Rutkowski observed that the defendant

---

[4] "The horizontal gaze nystagmus test measures the extent to which a person's eyes jerk as they follow an object moving from one side of the person's field of vision to the other. The test is premised on the understanding that, whereas everyone's eyes exhibit some jerking while turning to the side, when the subject is intoxicated the onset of the jerking occurs after fewer degrees of turning, and the jerking at more extreme angles becomes more distinct." (Internal quotation marks omitted.) *State* v. *Weed*, 118 Conn. App. 654, 658 n.1, 984 A.2d 1116 (2009).

[5] "The walk and turn test requires the subject to walk heel to toe along a straight line for nine paces, pivot, and then walk back heel to toe along the line for another nine paces. The subject is required to count each pace aloud from one to nine." (Internal quotation marks omitted.) *State* v. *Weed*, 118 Conn. App. 654, 658 n.2, 984 A.2d 1116 (2009).

[6] "The one leg stand test requires the subject to stand on one leg with the other leg extended in the air for [a set time period], while counting aloud . . . ." (Internal quotation marks omitted.) *State* v. *Weed*, 118 Conn. App. 654, 658 n.3, 984 A.2d 1116 (2009).

exhibited nystagmus, lack of smooth pursuit or jerkiness of the eyes, prior to ninety degrees. During the walk and turn test, the defendant took an improper number of steps, used his arms to balance, and failed to make heel-to-toe contact on a few of the steps. During the one leg stand test, the defendant used his arms to balance, placed his foot down, and stopped prior to the time elapsing.

On the basis of his observations during the field sobriety tests, Rutkowski determined that the defendant had been operating his motor vehicle while under the influence of alcohol and/or narcotics. Rutkowski then conducted a search of the defendant's vehicle on the basis of the defendant's previously mentioned statements that there was cocaine in the car. During his search, Rutkowski seized the small plastic container from the vehicle. He also observed a cooler in the back seat which contained several empty beer cans.

After determining that the defendant lacked the capacity to operate his vehicle safely and possessed narcotics, Rutkowski placed him under arrest and transported him to the police station. At the police station, Rutkowski asked the defendant if he wanted to take the breath test for alcohol, to which the defendant replied, "I know I'm probably going to fail the breath test." Thereafter, the defendant agreed to take two breath tests. Rutkowski used a Draeger Alcotest 9510 to conduct the breath tests. The first test was administered at 6:16 p.m. and resulted in a reading of 0.1008 percent blood alcohol content. The second test was administered at 6:36 p.m. and resulted in a reading of 0.0905 percent blood alcohol content. While he was processing the defendant and administering the tests, Rutkowski continued to engage with the defendant and asked him when he had started drinking. The defendant stated that he had one beer and a shot around 1 p.m. but stopped drinking around 1:30 p.m. He further stated

that he had smoked marijuana. Thereafter, in an amended
long form information, the defendant was charged with
possession of a controlled substance in violation of
§ 21a-279 (a) (1) and operation of a motor vehicle while
having an elevated blood alcohol content in violation
of § 14-227a (a) (2).[7] A jury trial was held on March 6
and 7, 2023. At trial, the state presented various exhibits,
which were admitted into evidence, and testimony from
three witnesses: Rutkowski; Joanna Urban, a forensic
science examiner II for the Department of Emergency
Services and Public Protection; and Robert H. Powers,
an associate professor in the Department of Forensic
Sciences at the University of New Haven and former
director of the state toxicology laboratory. The defen-
dant did not admit any exhibits into evidence nor did
he present any testimony. On March 7, 2023, after the
state had rested its case, the defendant moved for a
judgment of acquittal, which was denied by the court.
Thereafter, the jury returned guilty verdicts on both
counts. On March 8, 2023, the court, *M. Murphy, J.*,
sentenced the defendant on both counts. On count one,
the court sentenced the defendant to 364 days of impris-
onment, execution suspended after sixty days, followed
by two years of probation. On count two, the court
sentenced him to six months of imprisonment, execu-

---

[7] On March 11, 2020, the defendant was charged in an original information
with four offenses: (1) possession of a controlled substance in violation of
§ 21a-279 (a) (1); (2) operation of a motor vehicle while under the influence
of liquor or drug or while having an elevated blood alcohol content in
violation of § 14-227a; (3) operation of a motor vehicle without a license in
violation of General Statutes § 14-36 (a); and (4) failure to drive in proper
lane in violation of General Statutes § 14-236. The original information
reflected two docket numbers, one docket number was representative of a
criminal matter and the other docket number was representative of a motor
vehicle matter. Thereafter, on March 6, 2023, the state filed an amended
long form information, encompassing the two docket numbers, charging
the defendant with the following two counts: (1) possession of a controlled
substance in violation of § 21a-279 (a) (1) (docket number T19R-CR-20-
0181710-S); and (2) operating a motor vehicle while having an elevated blood
alcohol content in violation of § 14-227a (a) (2) (docket number T19R-MV-
20-0272021-S).

tion suspended after thirty days, with forty-eight hours constituting a mandatory minimum, and one year of probation. The court ordered the sentences to run concurrently. This appeal followed. Additional facts and procedural history will be set forth as necessary.

I

The defendant first claims that the two offenses, possession of a controlled substance and operation of a motor vehicle while having an elevated blood alcohol content, constituted two separate cases and, under General Statutes § 54-57,[8] were improperly joined in a single information by the state because they were not offenses "of the same character." In his appellate briefs, the defendant concedes that he did not raise this issue before the trial court and argues that it is nonetheless reviewable as plain error. During oral argument before this court, the defendant argued that the alleged improper joinder by the state triggered the trial court's obligation, sua sponte, to sever the offenses, and that its failure to do so constituted plain error.[9] We disagree and, accordingly, reject the defendant's claim.

---

[8] General Statutes § 54-57 provides: "Whenever two or more cases are pending at the same time against the same party in the same court for offenses of the same character, counts for such offenses may be joined in one information unless the court orders otherwise."

[9] The defendant also argues that this court may review this claim under its inherent discretionary power and supervisory authority. In his appellate briefs, however, the defendant fails to set forth the standard under which this court may invoke its supervisory authority or engage in any analysis of such a claim. Rather, the defendant's brief on the merits focuses solely on the application of the plain error standard of review. At oral argument, the defendant's counsel agreed with this court's assessment of the defendant's supervisory authority argument as being inadequately briefed but contended that the claim was not abandoned. We disagree. "We are not required to review issues that have been improperly presented to this court through an inadequate brief . . . . Analysis, rather than abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly. . . . Where a claim is asserted in the statement of issues but thereafter receives only cursory attention in the brief without substantive discussion or citation of authorities, it is deemed to be abandoned." (Citation omitted;

As a preliminary matter, we set forth our standard of review. A claim of plain error must, as its predicate, identify an error by the trial court necessitating review. Thereafter, "[t]wo elements must be satisfied in order to support a conclusion that a judgment must be reversed on the basis of plain error. An appellate court addressing a claim of plain error first must determine if the error is indeed plain in the sense that it is patent [or] readily [discernible] on the face of a factually adequate record, [and] also . . . obvious in the sense of not debatable. . . . This determination clearly requires a review of the plain error claim presented in light of the record. Although a complete record and an obvious error are prerequisites for plain error review, they are not, of themselves, sufficient for its application. . . .

"[T]he plain error doctrine is reserved for truly extraordinary situations [in which] the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . . In addition to examining the patent nature of the error, the reviewing court must examine that error for the grievousness of its consequences in order to determine whether reversal under the plain error doctrine is appropriate. A party cannot prevail under plain error unless it has demonstrated that the failure to grant relief will result in manifest injustice. . . .

"It is axiomatic that, [t]he plain error doctrine . . . is not . . . a rule of reviewability. It is a rule of revers-

internal quotation marks omitted.) *Lareau* v. *Burrows*, 90 Conn. App. 779, 780, 881 A.2d 411 (2005). Accordingly, because the defendant's claim as to supervisory authority is inadequately briefed, we decline to review it.

We further observe that the defendant does not argue that his claim, although unpreserved, is reviewable under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015), most likely because " '[w]hether multiple charges should be tried separately is within the court's sound discretion and generally is not of a constitutional nature.' *State* v. *Perez*, 87 Conn. App. 113, 121, 864 A.2d 52 (200[5]); see also *State* v. *Berube*, 256 Conn. 742, 749 n.7, 775 A.2d 966 (2001); *State* v. *Walton*, 227 Conn. 32, 55 n.20, 630 A.2d 990 (1993)."

ibility. That is, it is a doctrine that this court invokes in order to rectify a trial court ruling that, although either not properly preserved or never raised at all in the trial court, nonetheless requires reversal of the trial court's judgment . . . for reasons of policy. . . . Put another way, plain error review is reserved for only the most egregious errors. When an error of such a magnitude exists, it necessitates reversal." (Citations omitted; internal quotation marks omitted.) *State* v. *Blaine*, 179 Conn. App. 499, 505–506, 180 A.3d 622 (2018), aff'd, 334 Conn. 298, 221 A.3d 798 (2019).

The fundamental problem with the defendant's claim is its presumption that the trial court had a sua sponte obligation to sever the offenses. Although the defendant's appellate briefs identify the error for review as the *state's* improper joinder of the two offenses, as stated previously, the plain error doctrine requires the appellant to identify an error *by the trial court* for review, rather than the alleged improper conduct of the opposing party. During oral argument before this court, the defendant's counsel elaborated on the state's purported obligations under § 54-57 and further argued that, in the absence of the state filing a motion to join the two cases, the trial court has a sua sponte obligation to separate them.[10] The defendant, however, has not

*State* v. *Madore*, 96 Conn. App. 235, 243, 899 A.2d 721, cert. denied, 280 Conn. 907, 907 A.2d 92 (2006).

[10] Specifically, the defendant's counsel asserted that the two offenses "shouldn't be treated as one case without the state first at least going to the court and . . . filing a motion to join them and having the court . . . conduct the analysis in the first place." When asked whether the trial court has a sua sponte obligation to separate the cases in the absence of the state filing such motion, counsel responded, "yes." Counsel proposed that this obligation would arise before trial and raised an exchange between the state and the court during a February 27, 2023 hearing as an example. There, the trial court, *Klatt, J.*, noted that the offenses comprised a "dual file" and were listed separately on the jury list and then confirmed with the state that it was proceeding on both charges. The defendant's counsel contended that, in this situation, the court needed to "confirm that the state ha[d] actually taken the steps to join the two [offenses] together, rather than just treating them as a single case from the outset."

cited any authority for this proposition and we are aware of none, and for good reason. The law is just the opposite. In *State* v. *Berube*, 256 Conn. 742, 748, 775 A.2d 966 (2001), our Supreme Court declined to review a defendant's unpreserved claim as to severance. In that case, the defendant was charged in two informations that were joined for trial, during which the defendant did not raise the issue of severance. Id., 746, 747. On appeal, the defendant claimed that the trial court improperly failed to sever the two cases and that the joinder prejudiced him. Id., 747. Our Supreme Court concluded that it was not bound to review the defendant's claim on appeal because he failed to raise the severance issue at trial. Id. The court was unpersuaded by the defendant's attempt to secure review pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), or as plain error. *State* v. *Berube*, supra, 749 n.7. With respect to the latter claim, the court held that "the trial court did not commit plain error by failing to sever, sua sponte, the cases for trial." Id. The court's disinclination to consider the defendant's claim arose from the fact that the defendant may have strategically chosen to have the offenses tried together and, thus, waived any constitutional claims he may have had with respect to joinder. Id., 748. The court reasoned that "[t]he defendant's silence, when faced with the prospect of a joint trial, may have been for tactical or other valid reasons. See *State* v. *Walton*, 227 Conn. 32, 55 n.20, 630 A.2d 990 (1993). . . . See, e.g., *United States* v. *Romero*, 54 F.3d 56, 59–60 (2d Cir. 1995), cert. denied, 517 U.S. 1149, 116 S. Ct. 1449, 134 L. Ed. 2d 568 (1996) (counsel did not pursue severance for tactical reasons); *United States* v. *Jackson*, 33 F.3d 866, 875–76 (7th Cir.1994), cert. denied, 514 U.S. 1005, 115 S. Ct. 1316, 131 L. Ed. 2d 197 (1995) (court presumed that failure to seek severance was tactical decision); *United States* v. *Cyprian*, 23 F.3d 1189, 1194 (7th Cir.), cert. denied,

513 U.S. 879, 115 S. Ct. 211, 130 L. Ed. 2d 139 (1994) (counsel did not pursue severance for tactical reasons). Thus, to consider the defendant's claim on appeal would be to impose an untenable burden on the trial court and would amount to appeal by ambuscade." (Footnote omitted; internal quotation marks omitted.) *State* v. *Berube*, supra, 747–48.[11] The same is true in the present case. We cannot conclude that the trial court committed plain error simply because it did not question what may have been a tactical choice by the defendant or his counsel. This is especially true when a straightforward remedy to the purportedly improper joinder—a motion to sever pursuant to Practice Book § 41-18—was available to the defendant.[12] Consequently, we cannot conclude that the court's failure sua sponte to sever the

---

[11] Our Supreme Court has similarly rejected claims that a trial court has a sua sponte obligation to sever the trial of codefendants if "the facts available to the court prior to trial and developed during the trial" lead the court to believe that a joint trial will prejudice one of the defendants. See *State* v. *Varricchio*, 176 Conn. 445, 447–48, 408 A.2d 239 (1975) ("There is no affirmative duty on the part of the court to move for separate trials. . . . A motion to sever is addressed to the sound discretion of the court. . . . The motion should be made prior to commencement of the trial . . . and it is the party's responsibility to present information to the court from which it can determine whether the defenses are going to be antagonistic or the evidence will unduly prejudice either or both defendants." (Citations omitted.)). As it did in *Berube*, the court in *Varricchio* recognized that a defendant's decision to forgo a motion to sever may be strategic in nature. Id., 449.

[12] Although Practice Book § 41-18 provides in relevant part that, "[i]f it appears that a defendant is prejudiced by a joinder of offenses, the judicial authority *may*, upon its own motion . . . order separate trials," it does not create a sua sponte obligation on the court to raise the issue of severance. (Emphasis added.) Furthermore, because § 41-18 permits the court to raise the issue of severance "upon its own motion," the parties would necessarily have an opportunity to be heard in response to the court's motion. See *Cameron* v. *Santiago*, 223 Conn. App. 836, 843–44, 310 A.3d 391 (2024) (due process requires that parties be given opportunity to address issues raised sua sponte by court). The court cannot unilaterally order severance, as the defendant seems to suggest.

Moreover, we note that neither in his appellate briefs nor during oral argument before this court did the defendant argue that the trial court abused its discretion by not making its own motion to sever the cases pursuant to Practice Book § 41-18. Although the state seems to construe

offenses for trial constituted error, let alone plain error. See *State* v. *Groomes*, 232 Conn. 455, 467, 656 A.2d 646 (1995) (concluding that trial court did not commit plain error by failing to sever, sua sponte, first three counts of information).[13]

## II

The defendant next claims that the evidence was insufficient to prove beyond a reasonable doubt that he operated a motor vehicle while having an elevated blood alcohol content in violation of § 14-227a (a) (2). Specifically, the defendant argues that the state was required to prove beyond a reasonable doubt that the defendant's blood alcohol content was greater than 0.08 percent but "the evidence at trial showed that the [breath test] would overstate the blood alcohol content for roughly one quarter of the population." The defendant argues that, because he could be part of this

the defendant's claim as such, because the defendant has not raised such a claim, we do not consider whether the court's failure to raise the possibility of severance pursuant to § 41-18 was, in the present case, an abuse of its discretion.

[13] In his reply brief, the defendant disputes the state's assertion on appeal that the defendant had "the opportunity to challenge the state's charging document prior to trial." The defendant argues that the state "ignores the circumstances under which that charging document was presented. At the time that the defendant's trial counsel came into the case, there was already a single information listing two offenses from different dockets, and the case had been pending for over eight months. Counsel reasonably could presume that the state had gone through the proper procedure to join those offenses prior to his appearance. In other words, counsel had no notice that the charges were improperly joined in the first place, because the joint information was filed before the defendant's counsel was assigned to the case." This argument requires little discussion. The transcripts of the trial court proceedings reflect that the defendant was represented by counsel at each court appearance and the original information charged the defendant with both counts. A review of the trial court file also reflects no motion by the state to join the offenses for trial. Furthermore, Practice Book § 41-18 does not limit the defendant's ability to seek to sever the offenses for trial. Consequently, new counsel could have sought severance if he could demonstrate prejudice to the defendant, even if the court previously had granted a motion by the state to join the offenses for trial.

roughly 25 percent of the population, there was, as a matter of law, a reasonable doubt as to his guilt. We are not persuaded.

The following facts and procedural history are relevant to our resolution of this claim. At trial, Rutkowski testified as to his interaction with the defendant, including his observations of the defendant's statements, behavior, and performance of the three field sobriety tests. He described the defendant's lane change as "abrupt" and stated that the defendant did not use a turn signal. He testified that, during the traffic stop, he noticed that the defendant's breath smelled of alcohol, he slurred his words when he spoke, and he had bloodshot and glassy eyes. Rutkowski also recounted that he observed several empty beer cans in the defendant's vehicle and that, during the traffic stop, the defendant stated that he had pulled over to call his wife to ask her to pick him up because he was unable to drive. Rutkowski testified that the defendant did not perform any of the three field sobriety tests to standard. He testified as to the defendant's statements at the police station, including the defendant's statements that he previously consumed alcohol earlier in the day and the defendant's prediction that he would fail the breath test. Rutkowski also testified as to the breath test results, which expressed that the defendant's blood alcohol content was 0.1008 percent at 6:16 p.m. and 0.0905 percent at 6:36 p.m. on the date of his arrest. The jury also had the opportunity to view the video footage from Rutkowski's body camera, which captured the incident from the initiation of the traffic stop through the administration of the breath tests and the booking of the defendant at the police station.

Powers testified for the state as an expert witness about the results of the breath tests and the effect of alcohol on the body. Referencing the admitted breath test results, Powers extrapolated back to the time when

the defendant was operating his vehicle and opined that defendant's blood alcohol content would have been approximately 0.12 percent.[14] Powers further testified as to the physical effects of a blood alcohol content of 0.08 percent or higher. He explained that a driver's ability to stay within lanes or track the road is affected once their blood alcohol content reaches 0.08 or 0.1 percent. He further testified as to how a person's performance on the standardized field sobriety tests correlates to blood alcohol content as follows:

"[Powers]: Around the 0.08, 0.1 and higher, we start to see the effects on physical abilities to perform the standardized field sobriety tests. . . . [T]he standardized field sobriety tests are kind of a blunt instrument. The Draeger measures very exactly. The standardized field sobriety tests are not quite as exact. So, at a 0.1, 0.08, around in there I expect to see some clues on the standardized field sobriety tests. Below that, I really only expect to see the horizontal gaze nystagmus test show all three clues on an individual with greater than about 0.05 grams per deciliter. The horizontal gaze nystagmus test is much more sensitive than the other two. So, the [horizontal gaze nystagmus] kicks in at about 0.05. The walk and turn and one leg stand test . . . tend to start kicking in at about an 0.08 and higher. But again, there's kind of a broad range there so we don't try to narrow in too much on those.

"[The Prosecutor]: And would it be your expert opinion to a reasonable degree of scientific certainty that the defendant was over a 0.08?

---

[14] At trial, Powers described the defendant's blood alcohol content while operating the vehicle as 0.12 grams per deciliter, which is equal to 0.12 grams of alcohol per 100 milliliters of blood. Powers testified that the Draeger test expresses blood alcohol content as "alcohol per 210 liters [of air], which is equivalent to 100 milliliters of blood." Powers explained that, although the exact unit referred to can differ, they "all basically refer to the same number," i.e., grams of alcohol per 100 milliliters of blood as a weight to volume percentage.

"[Powers]: At the time of assessment, yes. Based on all the factors I took into consideration, yes."

Powers also testified as to how to the Draeger machine measures blood alcohol content. He explained that the machine first measures the amount of alcohol in a person's breath and then expresses it in a blood alcohol concentration through the use of a conversion factor. On cross-examination, defense counsel questioned Powers as to the conversion factor in the following exchange:

"[Defense Counsel]: You mentioned a moment ago [that] when we're looking at [the results of the Draeger test], that's the result of a conversion factor. Right?

"[Powers]: . . . There is a conversion factor between alcohol in the blood and alcohol in the breath. And that conversion factor is one to 2100 as used by the state. That's a little lower than the true average in the general population, but that's what's used in the state. So, the instrument expresses the result in terms of . . . 210 liters [of air], which is what you would expect in 100 milliliters of blood. So, using that conversion factor the amount of air in—or the amount alcohol in 210 liters [of air] is what's expected in 100 milliliters in blood. The Draeger . . . expresses that as alcohol per 210 liters [of air] which is equivalent to 100 milliliters of blood. So, the conversion factor is built into the process.

"[Defense Counsel]: . . . [T]he breath machine—it's working on an average, correct?

"[Powers]: Not exactly. The average is about 2370 but it uses the factor of 1:2100 rather than 1:2370.

"[Defense Counsel]: But regardless of what the average is that it's using, it's using an average, right?

"[Powers]: Yes.

"[Defense Counsel]: So, because it's using the average, any person who submits to a chemical test that person may not be this average that we're talking about?

"[Powers]: I wouldn't expect them to be.

"[Defense Counsel]: Of course. And because the machine is operating on an average, in fact, it could be overestimating someone's [blood alcohol content], correct?

"[Powers]: . . . It's actually underestimating for the majority of the population. There's only a small percentage that it is overestimating.

"[Defense Counsel]: . . . [B]ut there is a percentage of the population that it is overestimating?

"[Powers]: Yes.

"[Defense Counsel]: So, any specific person, their [blood alcohol content] really could be lower than what's on that test strip?

"[Powers]: Yes.

"[Defense Counsel]: And is it the only way we would really know if that test strip was accurate on March 10th, 2020, is if the person had submitted to a blood test at the same time?

* * *

"[Powers]: So, the concentration of alcohol in the air as reflected in the Draeger strip is going to be accurate or I would expect to be accurate. To the extent that the conversion factor, the 1:2100, is incorrect or is not an accurate reflection of the subject, that is—that's been pretty well explored . . . on a statistical basis. . . . So, we know the ranges in which 95 and 99 percent of the population would fall. So, I guess I would agree with your premise that I would not expect any particular

individual to have an exact 1:2100 blood-breath partition coefficient but, as I say for about [three-fourths] of the population, the Draeger is actually understating the . . . blood alcohol concentration. . . . But there are indeed individuals for whom it is overstating."

On redirect examination of Powers, the state further inquired as to how the conversion factor affected his opinion:

"[The Prosecutor]: [Do] any of the factors that were discussed . . . change your opinion?

"[Powers]: No. I do take into account the uncertainty associated with the process of breath—interpolating a blood alcohol from a breath. So, I take that into account in my considerations as a part of my responsibility and due diligence."

The defendant's sufficiency claim is based entirely on Powers' statement that the Draeger test understates the blood alcohol concentration for "about three-fourths of the population." The defendant reasons that this means that the test must overstate the blood alcohol concentration for approximately one-fourth of the population, and because the jury did not know what percentage of the population the defendant was in, the evidence was insufficient to convict him. We are not persuaded.

We begin with our well settled standard of review for sufficiency of the evidence claims. "In reviewing a sufficiency of the evidence claim, we apply a two part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [jury] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt . . . . This court cannot substitute its own judgment

for that of the jury if there is sufficient evidence to support the jury's verdict. . . .

"While the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. . . .

"On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the jury's verdict of guilty." (Internal quotation marks omitted.) *State* v. *Capasso*, 203 Conn. App. 333, 338–39, 248 A.3d 58, cert. denied, 336 Conn. 939, 249 A.3d 352 (2021).

"Section 14-227a (a) provides in relevant part that '[a] person commits the offense of operating a motor vehicle while under the influence of intoxicating liquor . . . if such person operates a motor vehicle . . . (2) while such person has an elevated blood alcohol content. . . .' 'Elevated blood alcohol content' is defined as 'a ratio of alcohol in the blood of such person that is eight-hundredths of one per cent or more of alcohol, by weight . . . .' " (Emphasis omitted.) *State* v. *Mosback*, 159 Conn. App. 137, 150, 121 A.3d 759 (2015).

The defendant argues that Powers' testimony at trial about the conversion factor established that "the [breath test] would overstate the blood alcohol content for roughly one-quarter of the population" and that,

without additional evidence of the defendant's conversion factor or the blood-breath partition coefficient, the jury was forced to speculate about whether the evidence at trial established the defendant's guilt beyond a reasonable doubt. With respect to the remaining evidence of the defendant's intoxication, the defendant contends that it was "insufficient to support the inference that the defendant had a blood alcohol content of above 0.08 at the time he was driving, because nothing was presented that would allow the jury to correlate that evidence with a precise blood alcohol level."

We conclude that, given the cumulative effect of the evidence in the record, there was more than sufficient evidence to support the jury's finding that the defendant had an elevated blood alcohol content as required by § 14-227a (a) (2). To establish that the defendant's blood alcohol content was greater than 0.08 percent, the state admitted the results of the breath tests that showed that the defendant had a blood alcohol content of 0.1008 percent at 6:16 p.m. and 0.0905 percent at 6:36 p.m. The state also offered the testimony of Powers, who estimated that the defendant's blood alcohol content was 0.12 percent at the time the defendant was operating the vehicle. That blood alcohol content clearly was greater than the legally permissible limit of 0.08 percent.

Although Powers testified on cross-examination that the Draeger machine underestimates the blood alcohol content for three-fourths of the population and that "there are indeed individuals for whom it is overstating," he explained on redirect examination that the uncertainties he was asked about on cross-examination did not alter his opinion to reasonable degree of medical certainty that the defendant's blood alcohol content was greater than 0.08 at the time he was operating his vehicle. It was for the jury to assess the weight of

Powers' entire testimony about the reliability of the Draeger test and the conclusions he drew from it and the other evidence. See *State* v. *Kirsch*, 263 Conn. 390, 409, 820 A.2d 236 (2003) ("the defendant's challenges to the methodology [of an alcohol dehydrogenase based blood test] affected the weight of the testimony and not its reliability"). It is well established that "a trier of fact may accept or reject, in whole or in part, the testimony of an expert offered by one party." *Menard* v. *State*, 346 Conn. 506, 521–22, 291 A.3d 1025 (2023).

Further, despite the defendant's contentions to the contrary, the evidence regarding the defendant's interactions with Rutkowski corroborated Powers' opinion that the Draeger test did not overestimate the defendant's level of intoxication while he was operating his motor vehicle. Both Rutkowski's testimony and the body camera footage provided evidence of the defendant's level of intoxication, including his slurred words, the presence of empty beer cans, and his failed field sobriety tests. Furthermore, Powers' testimony explained how the defendant's observed behavior and performance on the field sobriety tests reflected an elevated blood alcohol content of 0.08 percent or higher. Powers testified that a driver's ability to stay within lanes or track the road is affected once blood alcohol content reaches 0.08 or 0.1 percent. Rutkowski testified regarding the defendant's operation of his vehicle that warranted the traffic stop, i.e., his abrupt crossing of three lanes of highway without using a turn signal. Significantly, Powers also testified as to the specific blood alcohol content that correlates with substandard performance on the field sobriety tests. He testified that, "the [horizontal gaze nystagmus] kicks in at about 0.05. The walk and turn and one-leg stand test . . . tend to start kicking in at about an 0.08 and higher." Between Rutkowski's testimony, the corresponding body camera

footage demonstrating the defendant's substandard performance on the walk and turn test and the one leg stand test, Powers' testimony, and the results of the defendant's breath tests, the jury had ample evidence to conclude beyond a reasonable doubt that the defendant had a blood alcohol content of 0.08 percent or higher when he operated his motor vehicle on the evening of March 10, 2020 in violation of § 14-227a (a) (2).

The judgments are affirmed.

In this opinion the other judges concurred.